**UNITED STATES of America**

v.

**John M. POINDEXTER, Oliver L. North, Richard V. Secord, Albert Hakim.**

**Crim. No. 88–0080.**

United States District Court, District of Columbia.

June 16, 1988.

Lawrence E. Walsh, Independent Counsel, Herbert Stern, Special Counsel, for U.S.

Richard W. Beckler, Washington, D.C., for defendant Poindexter.

Brendan V. Sullivan, Jr., Barry Simon, Washington, D.C., for defendant North.

Thomas C. Green, Washington, D.C., for defendant Secord.

F. Richard Janis, Washington, D.C., for defendant Hakim.

## MEMORANDUM OPINION AND ORDER

GESELL, District Judge.

### Introduction

The indictment in this criminal case was returned by the grand jury on March 16, 1988, after months of thorough investigation. Defendants Poindexter, North and Hakim have jointly moved to dismiss, claiming that their separate Fifth Amendment rights have been infringed by impermissible use of their compelled testimony. The motion was fully briefed and argued.

At the core of the indictment is the claim that the defendants formed and carried out a secret operation to place funds, including funds generated from an authorized government initiative to free American hostages, into unauthorized hands for their personal profit, by deceiving Congress, obstructing investigations, altering documents, abusing the tax laws, and by other means prohibited by law. These activities were allegedly conducted from the White House by the two government officials and two businessmen indicted.

These charges of criminal conduct were preceded by a series of widely publicized congressional committee hearings. Each of the four men subsequently named defendants testified at length concerning his involvement in events later recited in the 101–page, 23–count indictment. After pleading the Fifth Amendment, the three moving defendants were compelled by Congress to testify under separate orders granting each of them use immunity. They claim their immune testimony, both incriminating and otherwise, was thereafter used, directly and indirectly, to gain proof of their alleged criminal misconduct, thus violating their individual Fifth Amendment rights.

Since it was apparent that many trial days would be consumed if the indictment was fully tried, the Court has given extensive pretrial consideration to many aspects of this motion in order to determine, at least preliminarily, whether or not defendants' contentions have sufficient merit to preclude trial from the outset. For the reasons set forth below, the Court, after hearing testimony and considering other materials during this substantial preliminary inquiry, finds no basis for granting the motion pre-trial and has determined in its discretion and in accordance with procedures approved in this Circuit[1] that any final consideration of the issues must be deferred until after a full trial.

### A.

### Background

This case has its origin in an intense political controversy over the appropriate foreign policy for dealing with violent unrest in Nicaragua, which some considered a threat to national security. The President and the Congress had for some time been

1. In *United States v. De Diego*, 511 F.2d 818, 823–24 (D.C.Cir.1975), this Circuit established the following procedural rule:

A trial court faced with a pretrial motion to dismiss the indictment because of immunity granted by Federal or State Governments has basically four alternative procedures for determining whether or not the prosecution's evidence is tainted: (1) it can hold a pretrial evidentiary hearing; (2) it can hold a taint hearing during the trial as the questioned evidence is offered; (3) it can hold a post-trial hearing to determine taint; or (4) it can use a combination of these alternatives. In exercising its options where, as here, there are other defendants named in the indictment, the trial judge may order a severance so that the question of taint can be limited to the trial of the defendant claiming immunity.

at odds over this and related issues affecting Central America, with the latter seeking to limit the former's zeal for more strenuous military and economic involvement.

In November, 1986, Congress undertook to investigate when it came to believe that the administration was trafficking arms to Iran to bring about release of American hostages and that the proceeds had been diverted to the Nicaraguan contras for military assistance at a time when Congress had legislated to bar such aid to these resistance forces. Select Investigation Committees were eventually chosen from each house. These Committees merged their efforts, sharing information during some 40 days of public hearings, supplemented by closed executive sessions in what came to be known as the Iran–Contra Affair.[2] Public hearings commenced May 5, 1987. The activities of North and his associates became the focus of the Committee hearings.

Previously, on December 1, 1986, the President appointed a Special Review Board (the "Tower Commission") to conduct an investigation of the same disclosures and on December 4, 1986, Attorney General Meese requested appointment of an Independent Counsel pursuant to 28 U.S.C. § 592(c)(2) to investigate the possible criminal conduct of Lt. Col. Oliver L. North, a White House aide, and others unnamed. Lawrence E. Walsh, a former federal judge, was appointed Independent Counsel and given broad authority to investigate by Order of the Division for the Purpose of Appointing Independent Counsels of the United States Court of Appeals for the District of Columbia Circuit on December 19, 1986.[3] A grand jury was then empaneled to assist his investigation on January 28, 1987, and proceedings commenced.

After May 1, 1987, as the two inquiries went forward simultaneously there was a growing fire storm of publicity that brought practically every aspect of defendants' affairs into sharp focus. The moving defendants were vigorously attacked and vigorously defended in the midst of ardent political debate that accompanied the unravelling public disclosure by congressional committees.

Congress purported to pursue its legitimate legislative interest in the Iran-Contra affair but did so in such a persistent manner that it sought, among other things, to fix individual responsibility for conduct it considered unauthorized by law. When Hakim, North and Poindexter, a former Admiral, individually refused to testify before Congress and claimed possible incrimination by asserting their Fifth Amendment rights, they were each, in turn, granted use immunity pursuant to 18 U.S.C. § 6001 *et seq.* Their subsequent testimony in each instance was compelled.

The use immunity orders Congress sought and obtained were dated as follows:[4]

---

**2.** These investigations were conducted by the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Opposition and the House of Representatives Select Committee to Investigate Covert Arms Transactions with Iran. *See Report of the Congressional Committees Investigating the Iran–Contra Affair,* H.R.Rep. No. 100–433, S.Rep. No. 100–216, 100th Cong., 1st Sess. (Ordered printed November 17, 1987).

**3.** Mr. Walsh received a dual appointment from the Attorney General on March 5, 1987. *See* 52 Fed.Reg. 7270 (March 10, 1987), 9241 (March 23, 1987). Defendants have challenged the validity of Independent Counsel's initial designation and the legality of grand jury proceedings conducted by him. This issue has been deferred pending action by the United States Supreme

Court in *Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 1571, 99 L.Ed.2d 887 (1988).

**4.** Provisions of the immunity statute are keyed to the particular proceeding in which immunity is conferred: court or grand jury, formal administrative or congressional. *See* §§ 6003–6005. Although Section 6005 requires that Congress serve the Attorney General with notice of its intention to immunize a witness, it is solely within Congress' discretion to seek an immunity order and the court's role in granting such an order is purely procedural. Thus, there always exists the real possibility that Congress' discretionary decision that immunizing a witness will best serve the public interest may interfere with the law enforcement activities of the Executive Branch, raising the very issues presented by the instant motions.

Hakim — April 10, 1987
Poindexter — May 1, 1987
North — June 3, 1987

Hakim gave his first public testimony before the Select Committees on June 3, 1987; North followed, commencing his testimony on July 7, 1987; and Poindexter first testified publicly on July 15, 1987.

Hakim is named a defendant in five counts of the indictment, Poindexter in seven counts, and North in sixteen counts. All three immunized defendants are named along with Secord, who testified without immunity, in Counts I, II and III of the indictment, which set forth the overall conspiracy, theft and fraud counts.

█ The congressional power of inquiry is very broad. Congress may compel witnesses to testify over their assertion of Fifth Amendment rights to remain silent for fear of incrimination by granting some form of immunity, as was done here, and it may cause a recalcitrant witness to be punished for contempt if this fails. Few formal procedures or evidentiary rules apply during this process.

This power to compel testimony in aid of legislative inquiry was assumed to exist by American legislatures even before the Constitution itself was ratified, both Houses of Congress took the same view thereafter, and the Supreme Court has recognized the constitutionality of this authority as an appropriate auxiliary function of Congress, sustaining this enormous nonjudicial power in spite of the obvious possibility of abuse.[5] In *McGrain v. Daugherty*, 273 U.S. 135, 175, 47 S.Ct. 319, 329, 71 L.Ed. 580 (1927), the Supreme Court, in upholding the investigatory authority of Congress, noted:

> The contention is earnestly made on behalf of the witness that this power of inquiry, if sustained, may be abusively and oppressively exerted. If this be so, it affords no ground for denying the power. The same contention might be

directed against the power to legislate, and of course would be unavailing.

Thus there is no doubt that Congress can perform its legislative functions through inquiry without regard for the impact its investigation may have upon a prospective or ongoing criminal prosecution.

However, in this instance, Congress was aware of the conflict and efforts were made to reconcile the special interests of both Congress and the Executive. Although Congress felt it needed the immunized testimony, Congress made it abundantly clear that it did not intend to prevent the prosecution of North and other major targets of the grand jury inquiry. Before any major participant was immunized, its own legal staff analyzed the evidence already developed before the congressional committees and by the Tower Commission to demonstrate to the Select Committees that ample proof of the principal crimes subsequently alleged in the indictment already existed and necessary proof was already known from the witnesses and documents available. In addition, the Select Committees gave Independent Counsel ample warning that grants of immunity were contemplated, delaying any public immunized testimony by the defendants even after orders granting immunity had issued. In granting immunity to each of the three defendants, Congress had no intention to stultify the Executive's enforcement of criminal law. Indeed, it was fully expected prosecutions would go forward since ample proof of wrongdoing apparently existed.[6]

As this brief background statement suggests, both Congress and the Executive have pursued their separate responsibilities and the Court is now called on to fulfill the role assigned the judiciary under our system of government to assure that the defendants' Fifth Amendment constitutional rights have not been infringed as a result of the actions of the legislative and executive branches.

---

5. Congress may not, of course, use its investigating power merely to call conduct it does not like to the attention of the public, that is, "expose for the sake of exposure" alone. Nothing of this sort is suggested here.

6. This is not the first instance where indictment followed a grant of immunity by Congress during a public investigation. *See United States v. Romano*, 583 F.2d 1 (1st Cir.1978).

### B.

### *The Immunity Statute*

▆▆▆ As previously noted, under 18 U.S. C. § 6001 *et seq.* Congress can compel testimony from an unwilling witness who invokes the Fifth Amendment privilege against self-incrimination by conferring immunity from use of the compelled testimony and evidence derived therefrom in subsequent criminal prosecutions.

Section 6002 of the immunity statute reads in full as follows:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

(1) a court or grand jury of the United States,

(2) an agency of the United States, or

(3) either a House of Congress, a joint committee of the two Houses, or a committee or subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but *no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case,* except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order. (Emphasis added).

This statute was not intended to prohibit a grand jury from indicting or a prosecutor from trying a person granted use immunity. It only limits direct use of the testimony itself and derivative use.

According to the House and Senate Reports, the phrase "any information directly or indirectly derived from such testimony" was chosen to conform to "present law" on "the use of evidence derivatively obtained." The Reports cite *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the seminal case on what is known as the "fruits" doctrine, as representing "present law." See S.Rep. No. 91617, at 145; H.R.Rep. No. 91–1188, at 12; H.R.Rep. No. 91–1549, at 42. Thus, "as legislative history demonstrates, Congress intended to incorporate the 'fruits' doctrine into the statute by use of the phrase 'directly or indirectly.' " *Pillsbury Co. v. Conboy,* 459 U.S. 248, 277–78, 103 S.Ct. 608, 624–25, 74 L.Ed.2d 430 (1983) (Blackmun, J., concurring in judgment).

In short, the section was intended to safeguard an unwilling witness compelled to testify as broadly as, but no more broadly than, the privilege against self-incrimination. *United States v. Apfelbaum,* 445 U.S. 115, 123, 100 S.Ct. 948, 953, 63 L.Ed.2d 250 (1980). Relying on their reading of Supreme Court interpretations of the Fifth Amendment, the statute's framers believed that immunity from the use of compelled testimony and evidence derived therefrom ("use and derivative use" immunity) was coextensive with the Fifth Amendment privilege against self-incrimination and based the statute upon that standard.[7]

---

**7.** The current federal statute was enacted in 1970. It superseded a multitude of federal statutes which barred prosecution of a witness compelled to testify on any matter logically related to the transaction which was the subject of the compelled testimony. Under these "transactional" immunity statutes, a rule was set up which barred prosecution of a compelled witness, even on independent evidence, so long as the prosecution was related to the immunized transaction. By contrast, the current statute substituted a "use restriction" rule and the word "immunity" in the new statute took on the meaning of "immunity" from having one's testimony or its fruits used against him in a criminal case. *See*

2 Working Papers of the National Commission on Reform of Federal Criminal Laws 1406 (1970).

One justification for this change was the contradictory treatments of immunized testimony and illegally coerced confessions; the latter results in the suppression of the confession and its fruits rather than the dismissal of the charge. The National Commission on Reform of Federal Criminal Laws, whose recommendation served as the model for the current statute, made the following comment on its proposed changes:

We are satisfied that our substitution of immunity from use for immunity from prose-

The Supreme Court in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), sustained the constitutionality of the use immunity statute, holding that the scope of "use and derivative use" immunity was indeed "coextensive with the scope of the Fifth Amendment privilege against compulsory self-incrimination." *Id.* at 448, 453, 92 S.Ct. at 1658, 1661. In *Kastigar*, the Court relied heavily on the logic and language of *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Justice Harlan, concurring in *Murphy*, succinctly stated the rule set up in that case, commenting that a state grant of immunity prohibits the use in a federal prosecution "*of state-compelled incriminating evidence or the 'fruits' directly attributable thereto.*" *Id.* at 91, n. 7, 84 S.Ct. at 1624 n. 7 This "exclusionary rule," the Court stated, "leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." *Id.* at 79, 84 S.Ct. at 1609.

*Kastigar*, in reaffirming this "exclusionary rule" concept, emphasized the "heavy burden" of proof it places on the United States by stating:

> "Once a defendant demonstrates that he has testified, under a ... grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that they had an independent, legitimate source for the disputed evidence." "This burden of proof, which we reaffirm as appropriate, is not limited to the negation of taint; rather it imposes on the prosecution the affirmative duty to prove that the *evidence* it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* 406 U.S. at 460, 92 S.Ct. at 1665 (Citations omitted) (Emphasis added).

*See also Murphy*, 378 U.S. at 79 n. 18, 84 S.Ct. at 1609 n. 18; *Pillsbury Co. v. Conboy*, 459 U.S. 248, 249–255, 103 S.Ct. 608, 610–613, 74 L.Ed.2d 430 (1983).

■ Accordingly, where a defendant under indictment has earlier received use immunity the prosecutor is prohibited from using not only the immunized testimony itself, but also any information which is the fruit of the immunized testimony; and the prosecutor bears the "heavy burden" of demonstrating that all its evidence at trial is derived from legitimate sources wholly independent of the compelled testimony; that is, the prosecution must not have been "led", directly or indirectly, to the discovery of evidence through the immunized testimony.

The Court in *Kastigar* did not expressly decide whether nonevidentiary use is prohibited to the same degree as evidentiary use. *See* 406 U.S. at 453–54, 459–60, 92 S.Ct. at 1661–62, 1664–65. It should be emphasized, however, that the rule originally set down in *Murphy* is an exclusionary rule focusing on the exclusion of tainted *evidence* from use by the prosecution, or as the Court in *Kastigar* held, the government need only prove that it obtained "the *evidence* it proposes to use" from independent sources. 406 U.S. at 460, 92 S.Ct. at 1664. (Emphasis added.)

Significantly, while the Court did note that the petitioners in *Kastigar* had raised arguments relating to "the subtle ways in which the compelled testimony may disadvantage a witness" (*id.* at 459, 92 S.Ct. at 1664), it did not impose the same affirmative burden on the prosecution to prove an absence of nonevidentiary use. *See id.* at 460, 92 S.Ct. at 1664. Instead, the Court responded to the nonevidentiary claims only by adding that the statute "barr[ed] the use of compelled testimony as an 'in-

---

cution meets constitutional requirements for overcoming the claim of privilege. Immunity from use is the only consequence flowing from a violation of the individual's constitutional right to be protected from unreasonable searches and seizures, his constitutional right to counsel, and his constitutional right not to be coerced into confessing. The pro-

posed immunity is thus of the same scope as that frequently, even though unintentionally, conferred as the result of constitutional violations by law enforcement officers.
*Id.* at 1446, quoted in *Kastigar v. United States*, 406 U.S. 441, 452 n. 36, 92 S.Ct. 1653, 1660 n. 36, 32 L.Ed.2d 212 (1972).

vestigatory lead,' and also barr[ed] the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Id.* at 460, 92 S.Ct. at 1664 (Citations omitted). Moreover, the Court recognized that the use immunity the statute provides is "analogous to the Fifth Amendment requirement in cases of coerced confessions." *Id.* at 461, 92 S.Ct. at 1665. When an incriminating statement has been obtained through coercion, the Fifth Amendment prohibits use of the statement or its "fruits"; thus "the 'fruits' doctrine provides all the protection the Constitution requires." *Pillsbury Co. v. Conboy,* 459 U.S. 248, n. 9, 103 S.Ct. 608, n. 9, 74 L.Ed.2d 430 (1983) (Blackmun, J., concurring in judgment). However, it should not be underemphasized that—although the analogy to coerced confession cases is appropriate—the prosecution in a use immunity case carries the far heavier burden of affirmatively proving not only a negation of taint but that *all* its *evidence* is "derived from legitimate sources wholly independent of the compelled testimony." *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664.

■ The defendants, however, take a far broader view of use immunity strictures. The concept of evidentiary use, it is suggested, should apply in the use immunity context to any use of immunized testimony to refresh the memory of a prospective witness and even the more subtle effects which full or even limited knowledge of the testimony can have on how a witness or a prosecutor exposed to it perceives an event. There is no authority for applying such an expanded view, except under very unusual

circumstances not present here,[8] and there is far stronger authority to the contrary.[9] These and other cases implementing the *Kastigar* doctrine are, in any event, fact oriented and depend on whether the factual circumstances will preclude the prosecutor from meeting his heavy burden of proof. On the outer limits of evidentiary use such as those defendants urge, where the borderline between evidentiary and nonevidentiary is obviously indistinct, the nature of a witness' exposure to immunized testimony and the manner in which the knowledge was applied become significant. Knowledge does not constitute impermissible taint in the same sense that taint from the use of the knowledge may defeat prosecution when it constitutes direct or derivative use leading to evidence that would not otherwise have been found or stimulates the prosecution itself.[10]

## C.

### *The Court's Preliminary Considerations*

The Court's preliminary pretrial inquiry has not been superficial. The Court has personally reviewed, *in camera,* the grand jury transcripts and exhibits at length; various precautions taken by Independent Counsel to avoid taint from exposure of the prosecution to publicity and immunized testimony were explored during his two days of public testimony; extensive exhibits illustrating the manner in which these precautions were implemented were filed, some publicly, others *in camera;* and substantial proof of Independent Counsel's legitimate independent leads to every signifi-

---

**8.** Unlike this case, in *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973), the prosecutor read the immunized testimony—unaware that it was immunized—and it caused him to initiate the prosecution and affected the planning of his trial strategy. *See also United States v. Barker,* 542 F.2d 479, 484 n. 9 (8th Cir.1976); *United States v. Bianco,* 534 F.2d 501, 511 n. 14 (2nd Cir.1976).

**9.** *See United States v. Crowson,* 828 F.2d 1427 (9th Cir.1987); *United States v. Byrd,* 765 F.2d 1524 (11th Cir.1985).

**10.** The semantic difficulties of using the words "taint" or "tainted" are often reflected in the briefs and arguments. In *In re Sealed Case,* 832

F.2d 1268, 1281 (D.C.Cir.1987), the Court referred to tainted testimony known to Independent Counsel. Defendants cite the case for the proposition that Independent Counsel "relied on" immunized testimony to learn a fact. (Reply Memorandum in Support of Motion of Defendant Oliver L. North for Severance, pp. 20–21.) While Independent Counsel could not use that knowledge or any information derived from it, his proof that he knew the same thing from other independent sources prior to the testimony would still enable him to prove the fact in spite of later tainted knowledge.

cant witness were carefully documented, again *in camera*.

The Office of Independent Counsel interviewed Secord on eleven occasions: April 29, 1987; April 30, 1987; May 13, 1987; May 14, 1987; May 20, 1987; December 11, 1987; January 22, 1988; January 25, 1988; February 26, 1988; March 9, 1988; and March 12, 1988. This was pursuant to an arrangement approved by his counsel that Secord's statements could not be used as testimony in a case-in-chief against him but could be used for purposes of cross-examination or in a direct case for perjury or false statements. Secord was instructed not to refer either directly or indirectly to any statements made under the grants of immunity to Hakim, North or Poindexter. During interviews totalling nearly 1,400 pages of transcript, Secord went into extraordinarily comprehensive detail about his knowledge of and involvement in almost every aspect of the Iran-contra matter, providing the prosecution with valuable leads and other background information for its case. Nearly 950 pages of transcript cover interviews occurring before either North or Poindexter were compelled to testify publicly.[11]

As will be developed later, Independent Counsel from the outset undertook to enforce a prophylactic system whereby various procedures prevented him or his associates directly involved in the prosecution from being exposed, directly or indirectly, to the immunized testimony, an approach recommended in the U.S. Attorney's Manual.

The Court turns first to the grand jury transcript which it has thoroughly examined with the aid of other supplemental information provided by Independent Counsel. It will be recalled, as previously stated, that Hakim did not testify publicly until June 3, 1987. Between April 10, 1987, when the use immunity order issued, and June 2, 1987, the grand jury heard many witnesses. Some of these witnesses testi-

fied to matters involved in another investigation, others included a few key prosecution witnesses who had been identified well before Hakim's testimony. Still other witnesses were questioned concerning materials previously subpoenaed or about matters unrelated to Hakim's testimony.

In the period between June 3, 1987, and June 29, 1987, when the grand jury discontinued taking testimony until the fall, it heard a variety of witnesses. Again the key witnesses were well known, a considerable number testified on matters wholly unrelated to any activity of Hakim, and independent leads had exposed others. The grand jury was reconvened to take testimony on September 2, 1987.[12] However, neither North nor Poindexter testified publicly before the Select Committees until North's testimony on July 7, 1987, and their testimony was completed by July 21, 1987, while the grand jury was still in recess.

After the grand jury commenced further hearings in September, 1987, 89 witnesses were heard. Many of these witnesses had previously appeared or were simply more routine witnesses associated with document identification and other formal steps preparatory to indictment.

No immunized testimony of any defendant was ever presented to the grand jury at any time in whole or in part.

In reviewing the grand jury transcripts the Court focused primarily on the following:

(1) The nature and extent of the instructions given the grand jurors designed to prevent exposure to defendants' immunized testimony.

(2) Any departure from these instructions suggested by questions or comments of counsel or jurors.

(3) Safeguards and techniques adopted by Independent Counsel to prevent inadvertent or derivative exposure of immune tes-

---

11. A fuller description of evidentiary material considered by the Court in reaching these preliminary determinations appears in the Appendix.

12. Some members of the grand jury did meet in the grand jury room on occasion between June 29 and September 2, 1987, to review exhibits and prior testimony.

timony by witnesses appearing before the grand jury.

The grand jurors were specifically, repeatedly and effectively instructed to avoid exposure to any immunized testimony. A sample of these warnings is already in the public record. (Court Ex. D, *Kastigar* hearing held April 25, 1988.) Many more warnings were given during the course of the grand jury's tenure.

The thrust of these warnings is illustrated by the examples set out below.

On April 10, 1987, when the grant of use immunity to Hakim became effective, but well before he testified, the grand jurors were instructed to cease reading or listening to any news reports concerning him. The instruction was as follows:

As you may have heard, the Congressional committees investigating this matter have given "use immunity" to certain individuals in return for their testimony. The grant of use immunity to Albert Hakim becomes effective today. We want to give you some explanation about what that means for your investigation.

When a person receives "use immunity" that does not mean that this individual may never be indicted or prosecuted for the criminal activities he may disclose while giving immunized testimony. It does mean that neither the Office of Independent Counsel nor you—the Grand Jury—may use, directly or indirectly, the testimony given under immunity in deciding whether to indict these individuals. In other words, if we present for your consideration a proposed indictment against Albert Hakim, your decision whether or not to indict cannot be based in any way on his immunized testimony before Congress or any evidence derived from it.

Because immunized testimony from Mr. Hakim, or information derived from his immunized testimony, may soon become public as a result of the Congressional grant of immunity to him, we believe you, the members of the grand jury, must take certain precautions. I am therefore instructing you that as a legal matter that, until further notice,

you should not read any newspaper or magazine articles, watch any television programs or listen to any radio reports that mention Albert Hakim. If you are reading something that makes reference to Mr. Hakim, as soon as you realize that he is being referred to, please stop reading it. If you are watching a program or listening to the radio and Mr. Hakim is mentioned, please switch the show off. In any event, you will be required to base any decision as to whether or not to indict an individual such as Mr. Hakim on the testimony and exhibits which you have reviewed and heard in the grand jury. However, by taking the precautions which I have described, we can all be sure that your decision whether or not to indict an individual such as Mr. Hakim will be based solely on non-immunized evidence.

Although Mr. Hakim's grant of immunity becomes effective today, it is anticipated that he may not be ... giving immunized testimony in Congress immediately. However, at a later date, we may receive word that Mr. Hakim will give immunized testimony which may be public and which may receive widespread publicity during the days that he is giving that testimony. If we become aware of such an event, we will advise you of it....

Now Mr. Hakim's immunity, as I said, becomes effective today. Further grants of immunity by Congress will become effective on future dates and we will promptly advise the grand jury as those become effective so that you may take the same precautions.

You should regard your obligation to avoid contact with immunized testimony as part of your duties as a grand juror, and you should take it as seriously as you have all of your other obligations as a grand juror....

Before leaving this subject, I must further instruct you with emphasis that you should draw no inference whatsoever with respect to Mr. Hakim from the fact that Mr. Hakim has received a Congressional grant of immunity. Such grants

of immunity do not necessarily mean or suggest that the person immunized has committed crimes or done anything unlawful. Therefore, I instruct you that you are not to consider the fact that Mr. Hakim has received such a grant of immunity as being pertinent to your investigation and, again, you are to draw no inferences for, against or with respect to Mr. Hakim based on the fact that he has received such immunity from Congress. Transcript of April 10, 1987 at 3–7.

These instructions were modified and expanded during the spring and summer of 1987. With the impending public immunized testimony of Hakim before the congressional committees, the grand jurors were warned on May 15, 1987 that they should avoid any media reports that "relate[ ] to the Iran/contra matter in any way." Transcript of May 15, 1987 at 3. They were also advised at that time, "if you are watching a television program, or listening to the radio, or any report comes on about the Iran/contra investigation or Iran/contra matter, turn the program off." *Id.* This instruction was copied and made into grand jury exhibit number 353 and served as a continuing reminder as grand jurors reviewed exhibits from time to time. These instructions were repeated numerous times, warning grand jurors not to expose themselves to any media reports concerning the Iran/contra affair.

When the immunized testimony of North and Poindexter became imminent, further instructions were given. Independent Counsel Walsh stated to the grand jury on July 1, 1987:

[Y]ou must, at really great expense and great inconvenience, avoid learning what Colonel North said. . . . I am asking you to impose on yourself the instructions you have imposed on yourselves ever since Mr. Hakim testified, but I want to reassert its importance now of avoiding reading anything about this investigation. There is nothing that is going to come out in public print that is as important as what is going to be presented to you and what has been presented to you.

Transcript of July 1, 1987 at 2–3. These instructions were repeated and marked as exhibits on July 6 and on July 13 when procedures for the jurors' review of grand jury transcripts and exhibits were again discussed.

Again on July 20, 1987, Associate Independent Counsel gave the following instruction to the grand jury:

Before I open it up to questions and before I leave, let me just remind you that you are operating under an instruction under which you cannot read any articles relating to Iran/contra, nor pay attention to news accounts which focus on those stories.

Our information is that Admiral Poindexter will be completing his testimony today, and that following Admiral Poindexter's testimony, Attorney General Meese, Secretary Weinberger, Secretary Schultz, and I believe a couple of other high ranking Administration officials will be testifying.

Now, under normal circumstances there would be no need for you to avoid testimony, but, regrettable, is our firm conviction that many of the questions that are going to be asked by Congressmen and Senators are going to be based on the immunized testimony of Lieutenant Colonel North and Admiral Poindexter. Indeed, we believe that the bulk of the examination is going to be matters raised in the context of those pieces of immunized testimony.

As a result, we must caution you still not to read any reports of the Iran/contra matter or listen to any news reports that cover those matters. It is a tremendous inconvenience. We understand that, but, as you know, we've been erring on the side of caution throughout, and we think the chances are simply too great that the questions will focus on matters raised by North and Poindexter to allow us to go ahead and listen to the testimony now.

Transcript of July 20, 1987 at 2–3. On September 2, 1987, when a grand juror indicated he had seen a headline concerning the constitutionality of the Independent

Counsel statute, counsel reminded, "[W]e still are under a limitation where we should not, and you should not be reading any articles on the Iran-contra matter." Transcript of September 2, 1987 at 5.

Finally, on March 16, 1988, immediately before the grand jury voted on the indictment submitted to them, Associate Independent Counsel gave the following instruction to the grand jurors:

> As you know, as you have heard many times, Albert Hakim, ..., John Poindexter, and Oliver North all testified before the congressional committees under grants of limited immunity. This means that their congressional testimony cannot be used against them by this grand jury or by our office.
>
> Now you have all been instructed repeatedly to avoid any exposure or reference to the immunized testimony of Hakim, ..., Poindexter and North. Nevertheless, some of you may have been accidentally exposed to some of this immunized testimony. Whatever testimony of these individuals that you may have been exposed to should not be considered or used by you in any way in interpreting the evidence before you in the grand jury room or in determining whether or not to vote an indictment.

Transcript of March 16, 1988 at 2. Shortly after receiving this instruction, the grand jury voted unanimously to indict the four defendants in this case.[13] There was undoubtedly ample probable cause for each count. Considering the fact alone that the great bulk of the evidence was clearly known to Independent Counsel before any defendant received use immunity, there is strong indication that the decision to indict was in no respect tainted.

There is clear indication that the grand jurors understood the warnings and instructions they received. Jurors were warned frequently. Since, as will appear, many grand jury witnesses were specifically advised at the opening of their testimony before the grand jury to avoid testimony based on immunized testimony, the jurors were thus indirectly reminded of their concurrent need to avoid exposure.

While there was no system requiring grand jurors to report about the casual overhearing of a comment or the sighting of a headline while away from the grand jury room, there is no indication in the transcript this ever occurred. The grand jury was attentive. As the warning instructions continued to be given throughout the grand jury sessions, it is significant that by early May, 1987, the conscientious foreman, without prompting, politely pointed out that cautions were being given every session, that the jurors were intelligent, logical people and that Independent Counsel could be assured that the jury, using common sense and intelligence, was taking all appropriate steps to act according to his instructions.

Independent Counsel also took other precautions to avoid exposure of the grand jury to immunized testimony. Beginning in July, 1987, the lawyers and investigators began instructing potential witnesses during interviews not to repeat any of the immunized testimony they may have been exposed to. When the grand jury reconvened in September, grand jury witnesses were formally instructed on matters relating to immunized testimony. Immediately after each witness swore the oath, Associate Independent Counsel were directed to instruct witnesses as follows:

> Certain witnesses have testified under Congressional grants of limited immunity before House and Senate Committees investigating the Iran/Contra matter. These witnesses include Albert Hakim, Oliver North, John Poindexter and the former CIA station chief in Costa Rica. Our Office is avoiding exposure to the immunized testimony of these witnesses I have just named. Please make sure that your answers to our questions are

---

**13.** Two replacement grand jurors were qualified, one in December, 1987 and one in January, 1988, after the immunized testimony had been taken before the Select Committees. Neither grand juror was questioned in any detail concerning any knowledge either might have of the content or nature of the immunized testimony. The records of the grand jury indicate that in the normal course of later events they were adequately warned.

based solely on your own personal knowledge and recollection of the events in question. Do not relate to us anything which you learned for the first time as a result of listening to or reading or hearing about immunized testimony.

This formal instruction was usually given immediately prior to the witness testifying before the grand jury. In addition, a limited number of cooperating witnesses agreed to avoid exposing themselves to any of the immunized testimony elicited by Congress.

Associate Independent Counsel appearing before the grand jury were apparently careful to avoid broad, rambling questions that might inadvertently invite generalized answers that comprehended facts not personally known to the witness but learned from immunized testimony. The questioning was precise and called for explicit, narrow responses. The practice was also generally followed of excusing a witness before a grand juror presented his or her own questions to make sure the inquiries were expressed so as to avoid inadvertent disclosure by the witness of immunized testimony.

Finally, it should be noted that the grand jury, in denying Secord's request to appear before them and present portions of the immunized testimony of his co-defendants, displayed a clear understanding of the potential consequences of their exposure to immunized testimony and a tenacious desire to avoid such exposure. The transcript reveals that the jurors clearly understood that they must avoid knowledge of immunized testimony, that they would be unable to tell whether or not General Secord was relying on immunized testimony if he could proceed before the jury without guided, precise questioning, and that the foreman had previously advised Associate Independent Counsel in a similar situation that the jury would walk out of the room if immunized testimony was presented. Transcript of January 11, 1988 at 9–13.

In considering the foregoing, it must be emphasized that the immunized testimony taken before the Select Congressional Committees was elicited relatively late and well after the apparent diversion of funds, various cover-up tactics and many other facts relevant and material to the charges in this indictment were known to Independent Counsel. Between January 28, 1987, and April 10, 1987, when the first order granting immunity to a defendant, Hakim, was entered, Independent Counsel issued numerous subpoenas duces tecum for voluminous records and had already presented substantial information to the grand jury. The revealing public report of the Tower Commission had issued and Independent Counsel had had access to interview memoranda, depositions and documents gathered by that inquiry from within the White House and elsewhere. In addition, proceedings before various congressional committees, the House Permanent Select Committee on Intelligence, the Senate Select Committee on Intelligence, the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Opposition, and the House Select Committee to Investigate Covert Arms Transactions with Iran, all relating to aspects of the matter under investigation, had already been held. These proceedings were extensive and informative. General Secord, former National Security Adviser Robert C. McFarlane, Secretary of State George P. Schultz, and Attorney General Edwin Meese III, for example, were among the congressional witnesses who had testified in public before defendant Hakim was compelled to talk.

Turning, then, from consideration of the grand jury to an examination of the possibility of exposure of the prosecuting attorneys and their immediate assistants to immunized testimony, there must be noted several administrative steps which were taken by Independent Counsel from an early date to prevent exposure of himself and his associate counsel to any immunized testimony. Prosecuting personnel were sealed off from exposure to the immunized testimony itself and publicity concerning it. Daily newspaper clippings and transcripts of testimony before the Select Committees were redacted by nonprosecuting "tainted" personnel to avoid direct and explicit references to immunized testimony. Prosecutors, and those immediately associated with them, were confined to reading these re-

dacted materials. In addition, they were instructed to shut off television or radio broadcasts that even approached discussion of the immunized testimony. A conscientious effort to comply with these instructions was made and they were apparently quite successful. In order to monitor the matter, all inadvertent exposures were to be reported for review of their possible significance by an attorney, Douglass, who played no other role in the prosecution after the immunized testimony started. The Court has reviewed *in camera* a file maintained by Douglass which consists of his miscellaneous papers recording, often in cryptic terms, incidents where Mr. Walsh, an Associate Independent Counsel, paralegal or a senior staff member inadvertently were exposed. Usually this exposure was to a headline or a bit of a broadcast bearing on the immunized testimony. Occasionally more formal memoranda of the same nature were sent to Douglass. His attention was also called to one or more instances where review of the redaction of press clippings suggested the need for further excision. Little, if any, of these papers has any special significance. In many instances it was apparent that Independent Counsel already had obtained through independent sources the information suggested by the inadvertent exposure. Often the information itself was so fragmentary that it lacked coherence or substance standing alone. In a very few situations the employee was detailed to wholly unrelated work at the employee's own suggestion or by Douglass.[14]

Overall, the file reflects a scrupulous awareness of the strictures against exposure and a conscientious attempt to avoid even the most remote possibility of any impermissible taint. Douglass apparently operated on a common sense basis. He received reports orally and in writing. Each report was resolved individually in the light of its nature and the role of the reporting individual. Approximately seventy-five reports were processed by Douglass over the period from July, 1987 to April, 1988. Only two or three appear to have had any semblance of meaningful significance.

Finally, the Court has received written materials from Independent Counsel demonstrating that all the prosecutor's substantive witnesses were known to him before the first immunity grant.[15] FBI and other records filed *in camera* show that Independent Counsel was led to these witnesses by sources wholly independent of the immunized testimony given before the Select Committees. All documents obtained by or subpoenaed by Independent Counsel, as well as interviews and leads already obtained before April 10, 1987, have been separated and sealed to ensure a full record of his independent development of facts and witnesses should that be necessary in more detail at a further post-trial *Kastigar* hearing.

■ Some nonevidentiary problems have been emphasized by defendants. Witnesses, probably a considerable number of them, have had their memories refreshed by the immunized testimony. This has occurred from hearing the testimony, reading about it, being questioned about aspects of it before the Select Committees and, to some extent, by exposure to it in the course of responding to inquiries within their respective agencies. None of this apparently occurred because someone wanted to harm a defendant or help the prosecution; it simply occurred in the natural course of events. Memory is a mysterious thing that can be stirred by a shaggy dog or a broken promise. There is no way a trier of fact can determine whether the memories of these witnesses would be substantially dif-

---

14. Defendants' motion for immediate access to the Douglass file is denied. The Court has read the file, which shall remain under seal. It would delay the trial, intrude into Independent Counsel's work product, and, moreover, rulings made herein as to the scope and effect of use immunity make disclosure wholly unnecessary, at least at this juncture.

15. The legitimate discovery of these witnesses by leads wholly independent of the compelled testimony cannot be overemphasized as an indication of the weakness of the present motion. *See United States v. Rinaldi*, 808 F.2d 1579, 1583, 1584 (D.C.Cir.1987); *United States v. Seifert*, 501 F.2d 974, 982–83 (5th Cir.1974).

ferent if it had not been stimulated by a bit of the immunized testimony itself. Thus, unless an independently discovered witness exposed to immunized testimony is barred by law from testifying against the compelled witness in a criminal prosecution, there is no way of determining, except possibly by a trial before the trial, whether or not any defendant was placed in a substantially worse position by the possible refreshment of a witness' memory through such exposure. No court has ever so required, nor did *Kastigar* suggest anything of the kind.[16] It gives this Court no concern, as a matter of law or fact. If testimony remains truthful the refreshment itself is not an evidentiary use.

█ Another related nonevidentiary problem concerns the significance of mere exposure to some or all of the testimony. Defendants in their zeal treat this as if even the tiniest exposure to a witness or grand juror constituted exposure to an incurable disease. Such is clearly not the case. Exposure to a fleeting snippet means nothing. It has no evidentiary coherence or impact. Even more significant exposure is trivial where the fact is already known through independent evidence. Surely the law is built at least partly on common sense and it cannot be—contrary to defendants' assertions otherwise—that a prosecutor who inadvertently overhears mention of a fact already confirmed by his own independent investigation can be said to have made a prohibited use of immunized testimony. Clearly the defendants' Fifth Amendment rights are not then affected. Similarly, the defendants' Fifth Amendment rights are not infringed if a witness hears immunized testimony and yet testifies solely to facts personally known to the witness.

Even where extensive publicity was generated which included references to testimony given under use immunity, there is no basis for applying a different standard than that stated by the Supreme Court in considering the effect of use immunity on an individual defendant's Fifth Amendment rights.

The Court has not relied merely on general denials of taint by Independent Counsel. Nothing has developed in the Court's preliminary inquiry into *Kastigar* and related problems which suggests the defendants who received use immunity have had their Fifth Amendment rights impaired in a manner that significantly affects their right to a fair trial. The good faith of Independent Counsel cannot be questioned on this record and his candid testimony and the many documents reviewed by the Court leave no doubt that he maintained and continues to maintain a vigorous program aimed at minimizing the exposure of himself and his prosecutorial staff to immunized testimony. No improper evidentiary use of the immunized testimony has appeared.

█ Given these factual circumstances, it is not difficult to reach a preliminary decision that the case should proceed to trial.

In summary, based on this preliminary but thorough review of the testimony, documents and other materials listed in the Appendix, the Court finds and concludes that:

1. Defendants' immunized testimony was not submitted to the grand jury in any form.

2. The grand jurors were effectively warned not to read about or look at or listen to this immunized testimony and it

---

**16.** Reference has already been made to the Supreme Court's refusal in *Kastigar* to heed petitioners' plea that subtle nonevidentiary uses of immunized testimony be considered and barred under the Fifth Amendment. It is significant here that petitioners pressed refreshed memory nonevidentiary use in their appeal brief before the Court, and later in their petition for rehearing argued that the Court "totally mistreats" the nonevidentiary issue in its opinion, again urging nonevidentiary use be barred, particularly in the context of the publicity that might be given immunized testimony where matters of public interest were concerned. Rehearing was denied. Brief for Petitioners at 38, *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Petition of Charles Joseph Kastigar and Michael Gorean Stuart, for Rehearing at 2–6, *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

played no part in the grand jury's unanimous decision to indict.

3. The grand jury transcript and exhibits reflect solid proof and ample probable cause to indict on each and every count.

4. None of the testimony or exhibits presented to the grand jury became known to the prosecuting attorneys on Independent Counsel's staff or to him personally either from the immunized testimony itself or from leads derived from the testimony, directly or indirectly.

5. The prosecuting attorneys and Independent Counsel have never read the immunized testimony.

6. Independent Counsel's staff was well aware through legitimate means of all significant witnesses to be called at trial and the essential documents long before any immunized testimony was given by the defendants; and, moreover, its investigators had been in direct contact with these witnesses.

7. The convening of a grand jury to consider possible criminal conduct of North and others was initiated by the Attorney General and grew out of the Attorney General's direct personal knowledge of possible criminal conduct. Immunization of the three defendants occurred much later and their immunized testimony did not serve to enhance the focus of Independent Counsel's investigation.

8. Independent Counsel has at all times proceeded in good faith taking strenuous precautions to safeguard the moving defendants' Fifth Amendment rights at great inconvenience and expense.

9. A person granted use immunity receives no assurance he will not be prosecuted and no such assurance is claimed or demonstrated in this case.

10. Independent Counsel has preliminarily met his "heavy burden" under *Kastigar*, the inquiry has disclosed no action by the government that has infringed the protection granted each moving defendant against the direct or indirect use of his compelled testimony, and no basis has appeared pre-trial to warrant dismissal of any immunized defendant.

Defendants have fully preserved their rights as outlined in their original filing of April 7, 1988. (Motion to Dismiss Indictment for Violations of the Fifth Amendment and 18 U.S.C. § 6001 *et seq.* (Defendants' Joint Pretrial Motion No. 1)). These rights shall not be impaired by deferring further consideration of *Kastigar* issues to post-trial proceedings should such proceedings prove necessary. If such proceedings need be held, Independent Counsel's claim that much of the immunized testimony was volunteered and therefore not entitled to exclusion under *Kastigar* can also be considered. This waiver issue has played no part in this preliminary consideration of the *Kastigar* issues. The Court also notes that its previous Orders relating to severance remove the major *Kastigar* evidentiary problems that might otherwise have arisen during a joint trial of the four defendants.

Accordingly, Defendants' Joint Pretrial Motion No. 7 to dismiss pretrial or, in the alternative, to hold a full *Kastigar* hearing pretrial is denied.

SO ORDERED.

# APPENDIX

The public and sealed materials relied on by the Court for the factual determinations made in this Memorandum are:

* [1] (a) The in-court testimony of Judge Walsh on April 25 and 27, 1988, together with the exhibits filed at that hearing.

* (b) The transcribed portions of the grand jury proceedings, including all testimony given, various nontestimonial portions transcribed at the Court's request, and all grand jury exhibits.

* (c) The "Douglass file."

* (d) Two bound volumes of material establishing independent "leads" to all trial witnesses providing substantive information who may be called in the government's case-in-chief.

1. The asterisks represent material sealed in whole or in part.

(e) Redacted newspaper clippings made available daily to Independent Counsel's prosecuting staff.

(f) Redacted congressional committee testimony made available to Independent Counsel's prosecuting staff.

* (g) The transcript of the voir dire of two replacement grand jurors by the Chief Judge.

* (h) Transcripts of eleven interviews of Richard V. Secord conducted by Independent Counsel between April 29, 1987 and March 12, 1988.

* (i) An index of all subpoenas issued during the course of this investigation.

* (j) Correspondence between Office of Independent Counsel and the United States Congress relating to the subject of use immunity and the relationship between the House and Senate Select Committees and Independent Counsel.

(k) Orders of the United States District Court for the District of Columbia granting Poindexter, North and Hakim use immunity for testimony before the Congressional Select Committees Investigating the Iran-contra affair.

(*l*) Orders issued by this Circuit's Special Division for the Purpose of Appointing Independent Counsels relating to the appointment of Lawrence E. Walsh as Independent Counsel in the matter of Lieutenant Colonel Oliver L. North, U.S.M.C., and others.

(m) April 10, 1987 Order issued by the Chief Judge authorizing the Clerk of Court to take custody of sealed "canned" material.