**UNITED STATES of America, Plaintiff,**

v.

**Frank GERACE, Robert Lo Cicero, Donald Martinelli and Toro Construction Company, Inc., Defendants.**

**Crim. A. No. 83–88.**

United States District Court,
D. New Jersey.

Dec. 15, 1983.

Robert Waller, Sp. Atty., U.S. Dept. of Justice, Camden, N.J., for plaintiff.

Robert F. Simone, Philadelphia, Pa., for defendant, Frank Gerace.

GERRY, District Judge.

In May and June of 1982, defendant Frank Gerace was compelled by the New Jersey Casino Control Commission to give testimony by way of deposition under a grant of immunity from that Commission. (Exhibits K–107–K–112, DK–1.) He was subsequently indicted on April 6, 1983 in two counts of a four count indictment charging him with violating 18 U.S.C. § 371 (conspiracy) and 29 U.S.C. § 501(c) (embezzlement from a labor union).

It is alleged in the indictment, among other things, that the defendants committed these crimes in connection with renovation work done by Toro Construction Company, Inc., ("Toro"), of which Lo Cicero and Martinelli were officers, on the union hall of Local 54 of the Hotel and Restaurant Employees and Bartenders International Union ("Local 54"); on the apartment of Robert Lumio, a former Local 54 official; and on the defendant Gerace's residence. The Government and defense counsel stipulated that a portion of the defendant's deposition testimony pertained to matters that are the subject of the indictment. (Tr. 10/31/83, 50:17—51:7.)

It is well settled that testimony compelled under a grant of immunity may

not subsequently be *used,* either directly or indirectly against the testifier in *any* criminal prosecution. *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1960); *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Once it is established that a defendant previously gave testimony under a grant of immunity to matters related to the federal prosecution, the burden shifts to the Government not only to negate the possibility that the immunized testimony has tainted the prosecution but to prove affirmatively "that the evidence it proposes to use at trial is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665. The Government's burden is a heavy one. *Id.* at 461–62, 92 S.Ct. at 1665; *United States v. Pantone,* 634 F.2d 716, 723 (3d Cir.1980). It must show that it did not use the compelled testimony or its fruits against the defendant *in any manner* [1] in connection with the prosecution. *Murphy,* 378 U.S. at 79, 84 S.Ct. at 1609. In fact, the witness and the Government must be "in substantially the same position as if the witness had claimed his privilege [to remain silent] in the absence of a state grant of immunity." *The Pillsbury Co. v. Conboy,* — U.S. —, 103 S.Ct. 608, 613, 74 L.Ed.2d 430 (1983); *Kastigar,* 406 U.S. at 458–59, 92 S.Ct. at 1664; *Murphy,* 378 U.S. at 79, 84 S.Ct. at 1609.

In the present case, where it was stipulated that defendant's deposition testimony covered matters which are the subject of this federal prosecution, this court was required to hold an evidentiary hearing during which the Government could attempt to sustain its burden of proof. The court chose to hold the hearing prior to the trial for the reasons stated on the record on November 1, 1983. (Tr. 15:9–25—27:25.) The hearing having been completed, the court is now prepared to make its findings of fact and conclusions of law.

■ Based on the evidence presented at the hearing on defendant's *Kastigar* motion, the court finds that the Government has met its heavy burden in establishing that its investigation, and the upcoming trial, of the defendant is in no way tainted, directly or indirectly, by the defendant's immunized testimony and that its proposed evidence is derived from legitimate sources independent of the immunized testimony.

The court would also add that at the close of the hearing (*see* Tr. 11/7/83, 10:11–21) and in defendant's proposed findings of fact and conclusions of law, it has been represented to the court that defendant does not dispute that the Government has adequately established legitimate, independent sources for the evidence it proposes to use at trial, nor that the attorney and agents involved in this case have no knowledge of the contents of the defendant's deposition.

A. *Legitimate, Independent Sources of Proposed Evidence.*

At the hearing, the Government presented what it expects its evidence at trial will be and the sources of that evidence primarily through the testimony of Special Attorney George Wilson, United States Department of Justice (Tr. 11/2/83) and Special Agent Ronald Chance, United States Department of Labor (Tr. 11/3/83, 39:23—136:1). The defense counsel had an ample opportunity to cross-examine the witnesses. Most of the exhibits which the Government will seek to introduce at trial had been obtained prior to May 28, 1982, the date of the commencement of the defendant's deposition. These records consist of:

(a) Records of Local 54 pertaining to the renovation of the union hall (Exhibits K–1—K–22, K–100, 101, 102), which were obtained from Local 54 by subpoena in April of 1981. (Tr. 11/2/83, 39:15—40:8; Exhibit K–114; Tr. 11/3/83, 60:17—61:4.)

---

**1.** Recent Third Circuit opinions have gone so far as possibly to proscribe the use of the testimony for morale boosting; or for refusing to plea-bargain, interpreting evidence, planning cross-examination, etc. *U.S. v. Pantone,* 634 F.2d at 722; *U.S. v. Semkiw,* 712 F.2d 891 at 894 (3d Cir., 1983).

(b) Records of the Toro Construction Company (K–23—K–75), which were obtained from the company after April 1981 but before September 1981 (Tr. 11/2/83, 42:1–16; Exhibits K–116 and K–117; Tr. 11/3/83, 60:17—61:4).

(c) Records of George P. Sparks, Electrical Contractor (Exhibits K–76—K–79, K–80–1—K–80–29), which were obtained from that company during the summer of 1981. (Tr. 11/2/83, 43:10–19; K–119, Tr. 11/3/83, 60:17—61:4.)

(d) Records of Daniel Falasca Plumbing, Heating and Cooling, Inc. (Exhibits K–81—K–85), which were received from that company in the summer of 1981). (Tr. 11/2/83, 44:17—45:11; Exhibit K–118; Tr. 11/3/83, 60:17—61:4.)

(e) Signature cards (K–86), copies of Treasurer's checks (K–87–1—87–7), withdrawal slips (K–88–1—88–7), a bank statement (K–99), pertaining to the Local 54 Building Fund, which were obtained from the Guarantee Bank prior to May 28, 1982. (Tr. 11/2/81, 46:16–25; Exhibit K–121; Tr. 11/3/83, 60:17—61:4.)

The remaining exhibits that the Government will seek to introduce at trial were received after May 28, 1982. The judgment that these exhibits might be useful to the Government's investigation was based on information independent of the defendant's deposition and, in many instances, had been made prior to May 28, 1982. Specifically, in February of 1982, Special Agent Chance had examined the records received from Toro Construction and Local 54 and had noted several significant items, including:

(a) The identities of all subcontractors that had purportedly worked for Toro on the Local 54 renovation job.

(b) The names of the Toro employees who had been employed by the company during the period of the Local 54 project; and

(c) The fact that there were discrepancies between what Toro represented to Local 54 it had paid to the subcontractors and what Toro's records showed was actually paid. (Tr. 11/3/83, 63:18—64:17.)

The records obtained after May 28, 1982, their source, and the basis for the decision to seek them, are as follows:

(a) A microfilm copy of a check, issued in July of 1979, to Donald Martinelli from Toro Construction in the amount of $10,000. (Exhibit K–89.) This was obtained from the Citizen's Bank (Tr. 11/2/83, 49:3–6), because the records of Toro Construction revealed that a check in this amount had been issued to Martinelli immediately following the completion of the Local 54 project. (Tr. 11/3/83, 80:11–16.)

(b) A deposit slip (Exhibit K–90), of a $500 deposit into the account of Toro Construction Co., Inc. at Citizen's Bank, which was received from the bank in August of 1982 (Tr. 11/2/83, 50:23—51:1). This was subpoenaed (Exhibit K–146) because Agent Chance had found, in the Toro Construction records, the customer copy of this slip which contained an ink notation referring to the defendant, and the Government wanted to determine if the notation had been made before or after the deposit was made. Agent Chance had found the customer copy prior to May 28, 1982. (Tr. 11/2/83, 51:9–23; 11/3/83, 74:11—75:8.)

(c) Handwriting exemplars of Donald Martinelli (Exhibit K–91), which were taken on June 22, 1982. (Tr. 11/2/83, 52:9—53:1.) The exemplars were taken to determine whether Martinelli had made certain writings on invoices that had been found in the Toro Construction Company records. (Tr. 11/2/83, 53:3—54:11.)

(d) Handwriting exemplars of Warren Patterson (Exhibit K–91A), which were taken in order to determine if Mr. Patterson had made the writings on the invoices found in Toro's records. (Tr. 11/2/83, 52:9—53:21.) Warren Patterson is the President of Dunn-rite Drywall, one of the subcontractors who worked for Toro. (Tr. 11/3/83, 88:12–17.)

(e) A group of photographs (Exhibit K–92) of the interior and exterior of the defendant's former home in Linwood, New

Jersey. The photographs were taken because Toro Construction's records, which were received in September, showed that Toro had done work on the house. (Tr. 11/2/83, 55:14—56:17.) These photos were taken by Agent Chance or Detective Lipski. (Tr. 11/2/83, 55:6–7.)

(f) Portions of the grand jury testimony of Robert Lo Cicero and Donald Martinelli (Exhibits K–94 and K–95) from June 15, 1982. Additionally, the Government intends to seek to make use of portions of Mr. Lo Cicero's May 18, 1982 testimony, and Mr. Martinelli's June 29, 1982 testimony. (Tr. 11/2/83, 57:12—58:10.) The defendant's deposition played no part in the questioning of these people before the grand jury, (Tr. 11/2/83, 58:11–17), and the subpoenas for both were issued prior to May 28, 1982. (Exhibits K–127 and K–128; Tr. 11/3/83, 60:17—61:4.) Mr. Martinelli was subpoenaed primarily because he had sent a list of work done by Toro Construction to the defendant, a fact which was discovered from the records of either Local 54 or Toro Construction. (Tr. 11/2/83, 130:18—132:12.)

(g) Records of Vineland Concrete (Exhibit K–96), which were obtained in order to determine if that company had provided concrete to the defendant's Linwood home. (Tr. 11/2/83, 59:24—59:17.) These were received from the company (Exhibit K–160; Tr. 11/3/83, 85:22—86:10), and were issued because a grand jury witness—James Harden—had testified that he saw a Vineland Transit truck pour the concrete. (Tr. 11/3/83, 86:12–17.)

(h) Two summary charts, which have not yet been prepared. These charts will summarize information from the Local 54 building fund bank account, and the discrepancies between what Toro claimed it paid the subcontractors and what other evidence shows was paid. (Tr. 11/2/83, 60:4–20.)

The Government also named the witnesses it intends to call at trial and specified the areas their testimony will cover. The testimonial evidence can be divided into two categories: evidence obtained after May 28, 1982 from persons whose identities and potential relevance *were known to the Government prior to that date* (and which pertains to things the witnesses saw, did, or overheard prior to May 28, 1982); and evidence obtained after May 28, 1982 from persons whose identities and potential relevance were not known to the Government before that date but who were identified and located solely through documents or testimony gathered during the federal investigation (all of which has been found to derive from legitimate, independent sources):

(a) Ann Ditmar, an employee of Local 54, will authenticate records from Local 54. (Tr. 11/2/83, 61:20—62:3.)

(b) William Darr, Olga Carroll and Thomas Carroll, all present or former employees of Toro Construction, (Tr. 11/2/83, 62:4-5; 145:13–19), will testify about matters they observed or overheard relating to Toro's office and bookkeeping procedures and about statements made by Mr. Martinelli and Mr. Lo Cicero. (Tr. 11/2/83, 62:4–20; 142:13—143:14.) Thomas Carroll was subpoenaed before the grand jury (Exhibit K–140), after Robert Lo Cicero testified that he had instructed Carroll to file a claim against Robert Lumio's estate. (Tr. 11/3/83, 72:11–16.) Thomas Carroll testified that Olga Carroll had been a bookkeeper for Toro during the time of the Local 54 job, and she was subpoenaed (Exhibit K–145) to see if she could explain bookkeeping notations on Toro's records. (Tr. 11/3/83, 73:23—74:9.) William Darr was identified in 1981 as another Toro bookkeeper and was likewise subpoenaed (Exhibit K–149) for questioning about the bookkeeping entries. (Tr. 11/3/83, 76:22—77:14.)

(c) Thomas Kissick, who appeared before the grand jury on May 18, 1982, will testify about the circumstances surrounding the acquisition of and renovations to the union hall and will identify union resolutions and other documents, (Tr. 11/2/83, 63:15–24), all pertaining to matters occurring in 1979. (Tr. 11/2/83, 182:15–19.)

(d) Reno Lappinen will testify about matters he heard and observed in 1979. (Tr. 11/2/83, 63:25—64:5; 182:6–11.) Lappinen

was originally subpoenaed to testify before the grand jury (Exhibit K–148) because he was identified in the records of Toro Construction as a Toro employee. (Tr. 11/3/83, 76:11–21.)

(e) Joseph Salerno will testify about actions he took and matters he overheard and observed in 1979. (Tr. 11/2/83, 64:6–22; 182:12–14.) Salerno had originally discussed these areas with the Government in July of 1981. (Joint Exhibit K–166.)

(f) Dennis Lott, Robert Zafian and James Harden, all present or former Toro employees, will testify about work they did in 1979 at the Local 54 union hall and the residences of the defendant and Mr. Lumio. (Tr. 11/2/83, 65:12–19; 163:6—164:3.) Lott (Exhibit K–133, Tr. 11/3/83, 66:20—66:9), Zafian (Exhibit K–137; Tr. 11/3/83, 70:2–14), and Harden (Exhibit K–154; Tr. 11/3/83, 80:20—81:7) were all identified as Toro employees in the Toro records.

(g) William Davis, of the New Jersey State Police, will testify about his analysis of some questioned documents, obtained from sub-contractors, and his comparison of the writing on them with the handwriting exemplars of Martinelli and Patterson. (Tr. 11/2/83, 65:24—66:5.)

(h) George Sparks, one of the subcontractors, will testify as to what work he and his company did on the union hall and will identify records of his company. (Tr. 11/2/83, 66:6–11.) Sparks originally appeared before the grand jury prior to May 28, 1982. (Exhibit K–122; Tr. 11/3/83, 60:17—62:9.)

(i) Daniel and Helen Falasca, both of Daniel Falasca Plumbing, Heating and Cooling, Inc., will testify about work that the company did at the Local 54 office and will identify and testify about company records, bills and payments. (Tr. 11/2/83, 66:12—67:4.) The records of Falasca Plumbing were obtained prior to May 28, 1982 (Exhibit K–118; Tr. 11/3/82, 60:17—62:9), and both Daniel and Helen Falasca were identified from those records and the records of Toro Construction. (Tr. 11/3/83, 77:22—78:23.)

(j) Representatives from the Citizen's and Guarantee Banks will identify copies of their own records (which were previously mentioned as Exhibits K–86, 87-1—87-7, 88-1—88-7, 99, 89 and 90). (Tr. 11/2/83, 67:5–12.)

(k) Detective Stanley Lipski will testify about the previously mentioned handwriting exemplars of Martinelli (K–91) and Patterson (K–91A), the taking of which he observed (Tr. 11/2/83, 67:13–16), and about the photographs taken of the defendant's former home (Exhibit K–92) and the union hall (K–93) (Tr. 11/2/83, 67:17–19).

(l) The grand jury foreman and the court reporter who transcribed the testimony of Mr. Lo Cicero and Mr. Martinelli will testify about the purpose of the grand jury investigation and will authenticate the transcripts. (Tr. 11/2/83, 67:20—68:11.)

(m) Diane Owen, a former teller at Citizen's Bank, will testify about the $10,000 check from Toro to Mr. Martinelli (Exhibit K–89) (Tr. 11/2/83, 68:12–160). Ms. Owen had been subpoenaed before the grand jury (Exhibit K–161) after the records obtained from Citizen's Bank (Exhibit K–155) showed that she was the teller who had cashed the check. (Tr. 11/3/83, 86:19—87:5.)

(n) Matt Calabria will testify about work he did in 1979 and 1980. (Tr. 11/2/83, 68:17–20; 170:4–10.) Mr. Calabria had been identified by James Harden as someone who had worked on the defendant's home. (Tr. 11/3/83, 83:12—84:4.)

(o) James and Charles Marandino, both of Marandino Construction, will testify about the scope of their subcontract work on the union hall. (Tr. 11/2/83, 68:21–24.) Charles Marandino had appeared before the grand jury on May 18, 1982 (Exhibit K–129), and at that time identified James Marandino as a person who had been involved in Marandino Construction during the Local 54 renovation job. (Tr. 11/3/83, 64:24—65:15.) Marandino Construction had been identified as a subcontractor from the records of Toro. (Tr. 11/3/83, 65:16–19.)

(p) Wilbert Cox, of Dowco Painting, will testify about work he did on the Local 54 project. (Tr. 11/2/83, 69:4–7.) Cox was identified as a principal of Dowco when Agent Chance served a subpoena (Exhibit K–136) on that company. (Tr. 11/3/82, 88:1–11.) Dowco was identified as a subcontractor in the Toro records. (Tr. 11/3/83, 68:19—69:25.)

(q) Warren Patterson, of Dunn-rite Drywall, will testify about work he did at the union hall and about documents pertaining to that work. Mr. Patterson was identified by Agent Chance when he served the subpoena to Dunn-rite (Exhibit K–135). (Tr. 11/3/83, 88:12–17.) Dunn-rite was identified as a subcontractor from the records of Toro and Local 54. (Tr. 11/3/83, 68:4–14.)

(r) Frederick English will testify about his sale of the defendant's residence and the effect on the sale of the renovations to the house. (Tr. 11/2/83, 69:16–22.) English had been subpoenaed (Exhibit K–139) after Agent Chance learned from the occupants of the defendant's former house that his (English's) company had sold it. (Tr. 11/3/83, 71:17—72:3.) Agent Chance learned that this house was the defendant's former residence from the records of Toro. (Tr. 11/3/83, 71:9–15.)

(s) Joanne Toffinetti may identify records from Marandino Construction Company. (Tr. 11/2/83, 69:23—70:8.) The Marandino records were received in 1981. (Tr. 11/2/83, 69:23–25; Exhibit K–120.)

(t) Harry Goldenberg, the attorney who handled the estate of Robert Lumio (who died in 1981), will identify probate and accounting records he prepared in the course of the settling of the estate. (Tr. 11/2/83, 70:9–13.) Mr. Goldenberg was subpoenaed during the investigation (Exhibit K–134) on June 9, 1982. He was subpoenaed after Robert Lo Cicero testified that he had instructed an attorney to file a claim against Lumio's estate for the renovation work done by Toro on Lumio's residence. Agent Chance identified Mr. Goldenberg as the estate attorney by reviewing back issues of a newspaper—The Atlantic City Press—and finding the notice

of probate, which listed Mr. Goldenberg as the attorney. (Tr. 11/3/83, 66:10—67:9.)

(u) Robert Stablini, of the accounting firm of Stablini and Petlev (Exhibit K–156), and Joseph Asselta, of the accounting firm of Mandino and Asselta (Exhibit K–153), are from two accounting firms that at various times did the accounting work for Toro Construction. They will testify about records of their firms relating to the accounting treatment of transactions which occurred in 1979, (Tr. 11/2/83, 71:17—72:5), specifically, the $10,000 check issued by Toro to Donald Martinelli at the conclusion of the Local 54 job. (Tr. 11/3/83, 79:19—80:19; 82:22—83:10.)

Finally, Special Agent Ronald Chance, the Labor Department investigative agent who participated in this investigation (Tr. 11/3/83, 40:17–21), was aware, as early as December 1980, of allegations that companies who performed services for Local 54 had to pay bribes and kickbacks in order to obtain that business. (Tr. 11/3/83, 53:2—54:22.) And in July 1981, Joseph Salerno told Chance that Philip Leonetti had told him that inflated bills were going to be submitted to Local 54 in connection with renovation work being done on the union's office building; that officers of Local 54 would approve the bills; and that Toro had done renovation work on Robert Lumio's apartment for which he did not pay.

The Government exposed its entire case and took great pains to establish the sources of all its evidence. The court is convinced that the Government's proposed evidence is derived from legitimate, independent sources.

B. *Extent of Any Access to the Deposition Testimony and Subsequent Use in Preparing for Trial.*

▮ Where the Government can establish an independent source for *all* of the testimony which it proposes to use at trial, it has gone a long way in carrying its burden. Nonetheless, such a showing alone is not sufficient where it appears on the record that the Government had access to the testimony. In that case, the court must consider the extent of the access and

the use of the testimony in the preparation for the trial. *See United States v. Semkiw*, 712 F.2d 891 (3d Cir.1983).

Here, there was considerable doubt before the hearing began that the Government had access to and thus could make any use of the immunized testimony. After reviewing the evidence, the court finds that, although the Government has been unable to construct an impenetrable "Chinese wall" around the testimony and thus cannot thoroughly negate the possibility of taint, there was no affirmative evidence of access and consequently none of any taint whatsoever; and all the evidence adduced at the hearing supports the finding that no use, either direct or indirect, was made of the immunized testimony.

The persons present during all or part of the deposition were New Jersey Deputy Attorneys General Mitchell Schwefel and Eugene Schwartz; New Jersey State Police Detective Henry Giancaterino; the defendant; his attorney, Ronald Kidd; attorney Michael Katz, who represented Local 54; Albert Daidone, a representative of Local 54; and the court reporters. (Exhibits K–107—K–112.) Acting Director Robert Sturges and Deputy Attorney General Gary Ehrlich saw the deposition transcripts. (Tr. 10/31/83, 9:20—10:1.) Prior to the taking of the deposition, Deputy Attorneys General Schwefel, Schwartz and Ehrlich, Acting Director Sturges and Detective Giancaterino were aware of the federal investigation and the need to avoid any disclosure of the testimony. (Tr. 10/31/83, 21:3—22:7; *Id.* at 126:2—127:4; *Id.* at 103:15—104:16; Tr. 11/3/83, 4:16—6:13; and Tr. 11/1/83, 60:16—61:7.) Specifically, Acting Director Sturges instructed each of the others verbally and in writing not to disclose the contents of the testimony to anyone other than the investigating team without first clearing the disclosure with him. (Tr. 11/3/83, 6:14—12:3; Exhibits K–162, 163, 164 and 165.)

The Commission ordered that the transcripts of the deposition be sealed and that the parties to the proceeding and their counsel be prohibited from disclosing any part of the testimony to anyone. (Exhibit D–K–1.) The transcripts remained in the custody of Schwefel and Ehrlich for little over a month following the deposition, at which time they were given to Detective Giancaterino. (Tr. 11/1/83, 67:18—68:10.) Detective Giancaterino did not place the transcripts in a special envelope or file marked confidential. He placed it in a filing cabinet right outside his office where all files involving the Local 54 case were placed. (Tr. 11/1/83, 68:23—69:6; 72:7–22; 82:18–20.) Detective Giancaterino had a key to that cabinet, *id.* at 69:13–14, and so did the secretary of Lt. Robert Kent, Supervisor of the Casino Licensing Section of the Division of Gaming Enforcement (DGE). (*Id.* at 69:16—71:4.) The cabinet remained opened during the day after the detective unlocked it (*id.* at 78:18—79:20), and it is possible that other agents of the DGE could have gained access to the file. But at the time the deposition was placed in the file cabinet, the DGE investigation into Local 54 had concluded. (*Id.* at 75:10—76:5.)

The section of the Richard J. Hughes Justice Complex in which the file cabinet is stored is not open to the public, *id.* at 80:3–5, and there was no public disclosure of the defendant's testimony to the Casino Control Commission or to any other group. (Tr. 10/31/83, 14:6–14.) Schwartz, Tr. 10/31/82, 127:5–10; Schwefel, *id.* at 26:4–24; Ehrlich, *id.* at 105:10–14; Giancaterino, Tr. 11/1/83, 61:21–23; and Sturges, Tr. 11/3/83, 20:11–14, all testified that they did not disclose the testimony to anyone except to Special Attorney Robert Waller of the federal Strike Force after he had obtained an order from the Casino Control Commission allowing him to receive it in order to respond to defendant's *Kastigar* motion.[2]

Special Attorney Wilson is the only attorney who participated in the federal investigation leading to the indictment of Gerace (Tr. 11/2/83, 25:12–13), and he will be the

---

**2.** Waller placed the transcripts into an envelope, the outside of which was marked with a warning that no one was to look into it without first consulting Waller. (Tr. 11/3/83, 137:17—138:2.) The envelope was kept in a safe. (*Id.* at 138:4–7.) Waller personally made one copy of

trial attorney for the United States. (Tr. 11/2/83, 3:10.) He was aware, prior to May 28, 1982, that the New Jersey Casino Control Commission was going to immunize the defendant, and the DGE would then depose him. (Tr. 11/2/83, 3:11—6:4, Exhibits K–103, 105, 106.) From previous investigations, he was familiar with the requirements of *Kastigar v. United States*, (Tr. 11/2/83, 10:25—15:5), and prior to the deposition he informed Robert Sturges, the acting director of DGE, that should the defendant testify pursuant to an immunity grant, he, the federal attorney, and the investigators would not be able to have any contact with DGE personnel about investigations of the defendant. (Tr. 11/2/83, 6:23—7:18.) Furthermore, prior to May 28, 1982, Wilson spoke with Agent Ronald Chance and other agents in the office about DGE's intention: he explained the *Kastigar* opinion to them, (Tr. 11/2/83, 15:7—16:11), told them to avoid contact with DGE personnel and explained that both direct and derivative use of immunized testimony was forbidden. (Tr. 11/2/83, 28:4—30:18; 11/3/83, 41:14—42:16.) Special Attorney Wilson has not had any conversations with DGE personnel about investigations into Local 54 or the defendant since before May 28, 1982. (Tr. 11/2/83, 33:18–22.)

Wilson testified that he has no knowledge of the content of the defendant's deposition, (Tr. 11/2/83, 30:20–22), and that neither the deposition nor the fact that the defendant was immunized had any effect on Wilson's approach to the case. (Tr. 11/2/83, 33:23—34:19.) The court has no reason to doubt that testimony.

Special Agent Chance was the principal Labor Department investigative agent who participated in this investigation. (Tr. 11/3/83, 40:17–21.) Other Labor Department agents played minor roles in the investigation.[3] (Tr. 11/3/83, 43:11–24.) Prior to May 28, 1982, he was aware of the fact that he could not learn of the contents of the defendant's deposition nor make any direct or derivative use of it. (Tr. 11/3/83, 4:14—42:16.) Since that time, he has learned nothing of the contents of the defendant's testimony. (Tr. 11/3/83, 44:16–19.)

None of the DGE personnel who are known to have learned of the deposition's contents disclosed those contents to anyone else. Neither the federal attorney nor the agents working on the federal investigation of the defendant learned of the deposition's contents from any of the persons known to have heard or seen it. It is true that a remote possibility exists that someone not involved in the case had access to and did read the deposition transcripts: the Government did not produce all of the people from the DGE who potentially had access to defendant's deposition transcripts. And thus it is further possible, as the defendant's proposed conclusions of law imply, that some agent from the DGE disclosed the deposition contents to one of the witnesses who testified before the grand jury in this matter: the Government did not eliminate this possibility by producing evidence that the witnesses who testified before the grand jury, subsequent to Gerace's deposition, were not aware of the contents of Gerace's deposition. This is *not* dispositive of the court's determination of this matter.

Although the quality of the burden of proof in *Kastigar* matters has not been

___

the transcript to be used as an exhibit in this hearing, which was kept in the safe drawer with the original. (*Id.* at 138:8–16.) No one has ever asked Waller for permission to review the deposition, and he has not disclosed its contents to anyone. (*Id.* at 138:3–4; 17–22.)

**3.** It appears that Karen Connelly, Stan Lipski and a "Mr. Watson" assisted Agent Chance. Connelly and Watson may have served subpoenas for Chance when he was unable to do so. (Tr. 11/3/83, 43:14–16.) Lipski, in addition to serving subpoenas, inventoried records and as-

sisted Chance in photographing the local hall and defendant's house and witnessed handwriting exemplars. (*Id.* at 43:14–24; Tr. 11/7/83, 5:12–18.) These agents were aware of the restrictions arising out of defendant's immunized testimony, *id.* at 44:4–15; and the parties stipulated that if called as a witness he would testify that he worked for both the state and the federal government—a dual employee—and that in the course of serving subpoenas, he did not talk to the witnesses about Frank Gerace or his testimony. (Tr. 11/7/83, 5:18–25.)

refined beyond being characterized as "heavy"—and this court does not now attempt to further refine it—the court does not believe that the Government must eliminate even the *remotest possibilities* of *doubt* in order to carry its burden. Where those most intimately involved in the federal investigation have had no access to the immunized testimony and thus are incapable of making use of it in any manner whatsoever, and have satisfied the court that they derived their evidence from sources independent of the testimony itself, the Government has met.its burden. The chance that an agent of the DGE other than one involved in the Local 54 investigation would seek to learn the contents of the deposition—which it appears were virtually worthless to the investigators—and then to divulge that information to a person scheduled to appear as a witness before the grand jury is so unlikely as not to be worth serious consideration.

Accordingly, the defendant's motion to dismiss the indictment by reason of *Kastigar v. United States* is denied. The accompanying order will be entered.

To the extent required, the foregoing constitutes this court's findings of fact and conclusions of law.