**UNITED STATES of America,**

v.

**Leona M. HELMSLEY, et al.**

**No. 88 Cr. 0219 (JMW).**

United States District Court,
S.D. New York.

Dec. 4, 1989.

See also, 720 F.Supp. 36.

Elliot Jacobson, Asst. U.S. Atty., New York City, for U.S.

Gerald Feffer, Eva Petko, Williams & Connolly, Washington, D.C., for defendants.

## OPINION AND ORDER

WALKER, District Judge:

Prior to trial, defendant Leona Helmsley moved for a hearing under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), based on a claim that her immunized testimony on June 11, 1985 and November 7, 1985 before two different state grand juries had tainted the federal prosecution on the instant indictment. The Court read the grand jury minutes containing Helmsley's testimony and found that it pertained only to jewelers' schemes to avoid New York state sales taxes by shipping empty boxes to out of state addresses. The testimony thus appeared to be wholly unrelated to the federal prosecution. However, instead of denying the motion, on August 18, 1988, the Court, following the guidance of Judge Weinfeld in *United States v. Gregory*, 611 F.Supp. 1033 (S.D. N.Y.1985), postponed the question until completion of trial at which time the Court, with the benefit of the trial evidence, would be best positioned to determine whether there was a sufficient nexus between the immunized testimony and the federal prosecution to warrant a hearing.

Defendant Helmsley was convicted on 33 counts of income tax related offenses arising out of a scheme whereby $1.2 million dollars of personal expenses of defendant and her husband, principally in connection with their residence in Greenwich, Connecticut, were fraudulently billed as business expenses. Following the trial, defendant renewed her motion for a *Kastigar* hearing. The Court reviewed both pre-trial and post-trial submissions, including an affidavit from the Government's lead prosecutor, Assistant U.S. Attorney James DeVita stating that the income tax investigation was based on evidence independent of the immunized testimony or any leads derived therefrom and affirmatively setting forth facts within his knowledge relating to the commencement and conduct of the investigation. Since Special Assistant U.S. Attorney Diane Peress had been designated from the New York State's Attorney General's office to the joint federal and state prosecution team, and had been present during one of Mrs. Helmsley's state grand jury appearances, the Court determined to hear live testimony from DeVita and Peress and did so on November 28, 1989. Subsequently, the Court requested and received an affidavit from Investigator Merrie Gordon, who had assisted in both the sales tax investigation and the federal income tax investigation.

After carefully evaluating the submissions, and hearing the witnesses, whose testimony the Court credits, the Court finds that to the extent the Government has any obligation to establish an evidentiary basis for the federal prosecution independent of Mrs. Helmsley's grand jury testimony, it has amply done so and that no further hearing is required under *Kastigar* and its progeny.

### I. *Whether a Full Kastigar Hearing is Warranted*

█ A witness who gives immunized testimony to a state grand jury receives immunity from its use in a subsequent federal criminal prosecution. *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Justice Harlan, concurring in *Murphy*, succinctly stated the rule: a state grant of immunity prohibits the use in a federal prosecution *"of state-compelled incriminating evidence or the 'fruits' directly attributable thereto."* *Id.* at 91, 84 S.Ct. at 1624. This "exclusionary rule," the Court stated, is designed to "leave the witness and the Federal Government in *substantially* the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." *Id.* at 79, 84 S.Ct. at 1610. (Emphasis added).

█ In 1970, Congress enacted a federal use immunity statute, 18 U.S.C. § 6001 *et seq.*, that was held to comport with the Fifth Amendment privilege against self-in-

crimination in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). That statute, although not by its terms applicable to state granted immunity, contains language of use immunity that the Supreme Court in *Kastigar* held to be "coextensive with the scope of the Fifth Amendment." That language, found in 18 U.S.C. § 6002, reads, in pertinent part, as follows:

> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
> (1) a court or grand jury of the United States,
>
> . . . . .
>
> and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but *no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case,* except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order. (Emphasis added).

*Kastigar*, in reaffirming *Murphy*, emphasized the "heavy burden" of proof placed upon the Government where a defendant's immunized testimony concerns matters related to the federal prosecution. The Court began by quoting *Murphy*, stating:

> 'Once a defendant demonstrates that he has testified, under a state grant of immunity, to *matters related to the federal prosecution,* the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.' 378 U.S., at 79 n. 18 [84 S.Ct. at 1609 n. 18]. This burden of proof, which we reaffirm as appropriate, is not limited to the negation of taint; rather it imposes on the prosecution the affirmative duty to prove

that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

406 U.S. at 460, 92 S.Ct. at 1665. (Emphasis added.)

The Court in *Kastigar* did not directly address the burden placed upon the Government where the subject matter of the immunized testimony was wholly unrelated to the subject matter of the federal investigation. However, in paraphrasing the rule set forth in *Murphy* and echoed in *Kastigar*, courts in this Circuit have clearly indicated that the "heavy burden" standard is triggered only when the subject matter of the two investigations is related. For example, in *United States v. Mariani*, 851 F.2d 595 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989), the Second Circuit recently stated:

> Where a witness is later prosecuted for an offense which was *the subject of his testimony given under immunity* it is recognized that the government bears a heavy burden to show that the evidence it uses in the subsequent prosecution was not derived directly or indirectly from the witnesses' immunized testimony.

*Id.* at 599–600. (Emphasis added.) Also *United States v. Nemes*, 555 F.2d 51 (2d Cir.1977), while holding that the government bore the burden of affirmatively showing independently derived evidence, made clear that before requiring the government to meet this burden, "the district judge should first require [the defendant] to demonstrate that she did in fact testify before the state grand jury under immunity *on matters related to the federal prosecution."* *Id.* at 55. (Emphasis added).

Moreover, the Court in *Kastigar* did not expressly decide whether nonevidentiary use imposes the same "heavy burden" on the Government or even whether such use is prohibited to the same extent as evidentiary use. After carefully reviewing *Kastigar* and its progeny, Judge Gesell in *U.S. v. Poindexter*, 698 F.Supp. 300 (D.D.C.1988), 306–7, concluded that a lesser standard

should be applied when nonevidentiary use is examined. He noted:

> the rule originally set down in *Murphy* is an exclusionary rule focusing on the exclusion of tainted *evidence* from use by the prosecution, or as the Court in *Kastigar* held, the government need only prove that it obtained 'the evidence it proposes to use' from independent sources. 406 U.S. at 460, 92 S.Ct. at 1665. (Emphasis added.)

Significantly, while the Court did note that the petitioners in *Kastigar* had raised arguments relating to 'the subtle ways in which the compelled testimony may disadvantage a witness' (*id.* at 459, 92 S.Ct. at 1664), it did not impose the same affirmative burden on the prosecution to prove an absence of nonevidentiary use. *See id.* at 460, 92 S.Ct. at 1664. This Court finds Judge Gesell's insight on this issue persuasive.

The defendant takes a far broader view of use immunity strictures. Just as the defendants unsuccessfully attempted in *Poindexter*, defendant here would have the Court apply *Kastigar*'s "heavy burden" standard to any use of immunized testimony, including mere knowledge of the existence of such testimony and "the more subtle effects which full or even limited knowledge of the testimony can have on how a witness or a prosecutor exposed to it perceives an event." 698 F.Supp. at 307. Like Judge Gesell in *Poindexter*, the Sec-

ond Circuit has rejected such a view,[1] and the only authorities to inquire into such "subtle effects" have done so under unique circumstances not present here.[2]

The Court thus rejects defendant's invitation to speculate as to subtle, tangential, nonevidentiary connections and the defendant's concomitant request for a hearing inquiring of every prosecutor, investigator, trial witness, grand jury witness, interviewee, and grand juror, and document production of every subpoena, every grand jury transcript, every interview note, "all procedures used and actions taken" in the investigation, the grand jury presentation, the immunizing of witnesses, the drafting of subpoenas, the evaluation of evidence, the determination of charges, and pretrial preparation. D. Kastigar Mem. at 10–15 and attachment A. No court has sanctioned such a far-flung fishing expedition.[3]

In sum then, the Court rejects defendant's expansive reading of *Kastigar* and instead applies the law as it has been consistently interpreted in this Circuit. Accordingly, unless the defendant has made a threshold showing either that the subject matter of the challenged prosecution and the immunized testimony are related, or that there is otherwise a distinct, as opposed to a speculative, possibility of taint, a *Kastigar* hearing such as the defendant has requested is not required. *United States v. Nemes*, 555 F.2d at 55; *see also*

---

1. In reviewing an Eighth Circuit decision, *United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973), the Second Circuit recently wrote:

 > To the extent that *McDaniel* can be read to foreclose the prosecution of an immunized witness where his testimony might have tangentially influenced the prosecutor's thought process in preparing the indictment and preparing for trial we decline to follow that reasoning.

 *Mariani*, 851 F.2d at 600; *see also United States v. Bianco*, 534 F.2d 501, 511 n. 14 (2d Cir.1976), *cert. denied*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976).

2. For example, in *United States v. McDaniel, supra*, the prosecutor read the immunized testimony—unaware that it was immunized—and it caused him to initiate the prosecution and affected the planning of his trial strategy. *See also United States v. Kurzer*, 534 F.2d 511 (2d Cir.1976) where an impermissible nonevidentia-

ry use was found when Kurzer was convicted on the testimony of a witness who decided to cooperate after being indicted in another matter on the basis of Kurzer's immunized testimony. Such unusual circumstances, closely tied to deep government involvement in developing the witness' motivation to cooperate, are not present here.

3. *See e.g., United States v. Catalano*, 491 F.2d 268, 272 (2d Cir.1974), *cert. denied*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974) (testimony of Assistant U.S. Attorney in charge of prosecution sufficient); *United States v. Mariani*, 851 F.2d 595, 599–601 (2d Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989) (testimony of two federal prosecutors and one federal agent sufficient); *United States v. DePalma*, 461 F.Supp. 778, 830 (S.D.N.Y.1978) (testimony of Assistant U.S. Attorney and review of FBI file of earlier investigation sufficient).

*United States v. Gerace,* 576 F.Supp. 1185, 1194 (D.N.J.1983) (government need not eliminate the "remotest possibilities of doubt.") Here a full blown *Kastigar* hearing is not warranted because defendant has neither raised a distinct, non-speculative possibility of taint nor satisfied the Court that the subject matter of the immunized testimony (avoidance of New York sales taxes on jewelry purchases from two jewelers) was related to the subject matter of the federal investigation (avoidance of federal income taxes by charging personal expenses of a home renovation to corporate entities).

## II. *Whether Independent Sources Were Established*

█ In any event, upon the present record of affidavits and live testimony, the Court is convinced, indeed persuaded beyond a reasonable doubt, that none of the Government's evidence before the grand jury or at trial was derived directly or indirectly from any immunized testimony of defendant Leona Helmsley. The extremely limited nature of Leona Helmsley's grand jury testimony, which involved wholly unrelated subject matter, strongly precludes any possibility that it was or could have been directly or indirectly used in the federal investigation. My review of the evidence introduced over eight weeks at trial, together with the history of the investigation, clearly demonstrates the independent source of the Government's evidence. This history, as outlined in DeVita's affidavit dated October 23, 1989 [4] and amplified by his testimony on November 28, 1989, is, in substance, as follows:

In 1986, DeVita was in charge of a federal investigation into an alleged tax fraud scheme whereby individuals donated worthless or depressed real estate to an institution called the St. John of Rila Eastern Orthodox Monastery and received an inflated appraisal of the real estate from an appraiser supplied by the monastery. Harry B. Helmsley was a subject of that investigation because he had made a donation of apparently worthless real estate to the monastery and had taken a $585,000 charitable deduction on his 1984 tax return as a result.

On December 2, 1986, DeVita read an article in *The New York Post* by Randall Pierson revealing that a *"Post* investigation" had found that "[m]illions of dollars in renovation bills for Harry Helmsley's Connecticut mansion were falsified as business expenses and charged to his Manhattan office buildings." The article specified various expenses relating to the renovation of Dunellen Hall, the Helmsleys' Connecticut estate, which were billed to Helmsley-owned companies. DeVita immediately called Dennison Young, Jr., the Deputy United States Attorney, to suggest that the Government expand its investigation to include the *Post* story's allegations. After speaking to U.S. Attorney Rudolph Giuliani, Young called back that same day and gave DeVita the green light to expand the scope of the existing investigation to include the allegations in the article.

Also on December 2, Mark Arisohn, a member of the law firm of Parcher, Arisohn & Hayes, called the U.S. Attorney's office to explain that he and his firm were representing the Helmsleys and their companies with respect to the matters referred to in the *Post* article. Arisohn agreed to meet with DeVita in the White Plains branch office of the United States Attorney's office the next day.

At the December 3 meeting, Arisohn maintained that the *Post* article was distorted and misleading, but confirmed the accuracy of some of its assertions: that approximately $4 million of corporate funds had been expended to renovate Dunellen Hall; that false or inaccurate invoices had been prepared with respect to some of the costs of the renovation; and that some of the false or inaccurate invoices had been initialed by at least Harry Helmsley and possibly Leona Helmsley. Nevertheless, Arisohn asserted that there was an innocent explanation for these transactions

---

**4.** On November 28, 1989, DeVita was available for cross examination on his affidavit. While defense counsel cross-examined DeVita, she did not challenge the investigative chronology set forth in DeVita's affidavit.

and stated his desire to cooperate with the Government and to provide whatever documents the Government requested in order to establish that no violations of criminal law had occurred. He told DeVita that all of the companies that made expenditures were subsidiaries of either Helmsley Enterprises, Inc. or Realesco Equities, Inc. and agreed to accept service of subpoenas addressed to those two companies for any and all documents referring to Dunellen Hall expenditures. DeVita served two such subpoenas on December 4, 1986.

The Government investigation then proceeded at a rapid pace. Over the next few days names of persons coming forward with information were passed from Young to DeVita, including Jeremiah McCarthy, a former Senior Vice President and director of the engineering department for Helmsley–Spear, the managing agent for much of the Helmsley real estate empire, who had been fired by Mrs. Helmsley in September, 1985. McCarthy's deep antagonism to Mrs. Helmsley was readily apparent to the Court from his extensive trial testimony.

On December 18, 1986, DeVita and I.R.S. Special Agent Alfred Cestari met with McCarthy, who had provided information to the *Post*'s Pierson and now provided the Government with a substantial amount of information relating to Dunellen Hall expenditures, including the names of numerous other employees involved in or familiar with the practice of charging Dunellen Hall expenditures to Helmsley business entities, and copies of the documents he had received from other Helmsley employees relating to the practice. Among McCarthy's documents were falsified invoices bearing the initials of Harry and/or Leona Helmsley, including false invoices of LaStrada General Construction Corporation and Ferran Enterprises, Inc. for work purportedly done at the Graybar Building and 230 Park Avenue, and false invoices from Audio Sound Productions, Inc. for an "Electronic Security System" for 230 Park Avenue. McCarthy assured DeVita that neither LaStrada nor Ferran had done any work at either the Graybar Building or 230 Park Avenue, and the documents themselves showed that the invoices for the "Electron-

ic Security System" were actually for an outdoor music system at Dunellen Hall. On the basis of the information and documents provided by McCarthy, the Government served grand jury subpoenas on approximately twenty Helmsley employees in December 1986.

In early January, 1987, the Government's investigation took a substantial leap forward when Parcher, Arisohn & Hayes released a series of documents which included two memos from Helmsley employee Frank Turco, dated August 22, 1985 and January 17, 1986. These "Turco memos", Government Exhibits 18 and 21 at trial, were the most crucial pieces of Government evidence to date since they provided a virtual roadmap for further investigation of the Dunellen Hall expenditures. Not only did the memoranda set forth on a cumulative basis the total amounts expended for Dunellen Hall, they identified the specific Helmsley business entity which made each expenditure, the vendor to whom each amount was paid, and the purpose for the payments. Moreover, the Turco memos revealed the existence of what were referred to at trial as the Dunellen "A" files and demonstrated Harry and Leona Helmsley's knowledge of the scheme, as well as Turco's role in informing them about the minute details of the corporate expenditures for their personal residence. Most importantly, the memos enabled the Government to determine precisely which Helmsley-owned companies' books and records would contain the critical documentary evidence to substantiate its case.

In late December 1986, after DeVita learned that the New York State Attorney General was conducting a parallel investigation based on the December 2 *Post* article, the United States Attorney's office began discussions with the New York Attorney General's office to confront potential problems presented by their independent but overlapping investigations. Eventually, the two offices decided to conduct joint federal and state grand jury investigations, with members of each of the two prosecuting offices cross-designated to participate in both grand-jury investigations.

Sometime prior to the actual cross-designations, which did not occur before late January 1987, DeVita learned that Mrs. Helmsley had testified under immunity before a state grand jury in an investigation conducted by the Attorney General's office, and in an investigation conducted by the New York County District Attorney's office. In fact, as noted above, Mrs. Helmsley had testified before different state grand juries under grants of immunity, related only to the purported nonpayment of sales tax by jewelers, on June 11, 1985 and on November 7, 1985. The first grand jury had investigated the jeweler Bulgari. The second had investigated the jeweler Van Cleef & Arpels.

DeVita never read Mrs. Helmsley's grand jury testimony, was never informed of its contents, never discussed the contents, and never saw any exhibits relevant to the grand jury proceedings.[5] Of the attorneys and investigators from the Attorney General's office to be cross designated only Diane Peress was present at the June 11, 1985 grand jury session. While she heard Assistant Attorney General Charles Testagrossa examine Mrs. Helmsley, Peress neither discussed the testimony with Testagrossa nor subsequently communicated its substance to anyone working on the federal income tax investigation.

To avoid any possible taint issues before the cross designation was effected, DeVita asked Assistant U.S. Attorney Kenneth Roth, then Chief of the United States Attorney's Appeals Unit, to review the grand jury testimony to determine whether Peress' participation in the federal grand jury investigation would present a problem. Roth thus acted as a "Chinese Wall." He learned of the nature and intended scope of the federal investigation and then reviewed

Mrs. Helmsley's grand jury testimony, assessing its content and possible applicability to the pending federal investigation.

Roth determined that Peress' participation would not present a problem because the subject matter of the grand jury testimony was unrelated to the matters the Government was investigating. According to DeVita, Roth "also said that the scope of the prior grand jury testimony was so limited he didn't think there would be any problem." Tr. at 21. Roth thus decided that the joint investigation should go forward. Peress has credibly testified to the obvious, that she made no use of Mrs. Helmsley's June 1985 testimony relating to Bulgari's sales tax scheme, directly or indirectly, in the subsequent joint income tax investigation.[6]

On January 21, 1987, DeVita sent an official memorandum to U.S. Attorney Rudolph Giuliani, requesting that the following individuals be designated Special Assistant United States Attorneys to participate in the federal investigation: Diane M. Peress and Alfredo F. Mendez, who would actually work on the investigation, and John M. Ryan and Edward D. Saslaw, Peress' and Mendez' superiors in the Attorney General's office. Gov. Ex. 4. The actual cross-designation occurred sometime thereafter. Tr. at 33–34; 61.

The Government continued to receive significant information in response to its pre-cross designation December 1986 subpoenas and to subpoenas served on the basis of the leads developed from the original documents obtained in late 1986. After Parcher, Arisohn & Hayes was replaced as attorneys for the Helmsley business entities by Michael Q. Carey, Esq., the Govern-

---

**5.** Of course, in the normal course of discovery, DeVita may have come in contact with material that was also contained in the grand jury exhibits.

**6.** Assistant Attorney General Charles Testagrossa who questioned Helmsley in the Grand Jury on June 11, 1985 had left his government position by the time of the cross-designation. State investigator Merrie Gordon, who did some work on the sales tax cases, was unaware of any Helmsley grand jury testimony and did not use

it in any respect in assisting the federal investigation. The grand jury that heard Mrs. Helmsley's November 7, 1985 testimony was run by the New York County District Attorney's office. No one from that office participated in the federal investigation and no one from the federal investigation saw the November 7 testimony. New York City Department of Finance lawyer Sheryl Parker, present in one or both state grand juries, played no role in the federal investigation.

ment had greater difficulty obtaining documents and most documents were produced only after the Government made motions to compel compliance.

In addition to the leads which came from the documents produced in response to subpoenas, key witnesses also provided leads and evidence. For example, Donald Hesselbirg, a senior financial executive of Helmsley Enterprises, whose name had been provided to the Government by McCarthy, first alerted the Government to the critical role played by Deco Purchasing & Distribution Co. in absorbing Dunellen Hall expenses. Hesselbirg's grand jury testimony led the Government to key documents pertaining to Deco and to the testimony of Milton Meckler.

There were two primary sources of information with respect to the non-Dunellen Hall personal expenses of Mrs. Helmsley. Maryanne DiMicco, Mrs. Helmsley's former administrative assistant, whose name McCarthy gave to the Government, provided information concerning Mrs. Helmsley's use of corporate funds for personal purchases of clothing and similar items. Edward Kleiner, the former controller of the Park Lane Hotel, provided further information relating to the use of the Park Lane to pay Mrs. Helmsley's personal expenses.

As this brief review demonstrates, the Government has sufficiently and clearly identified the independent sources for the evidence it used before the grand jury to indict and at trial to convict Mrs. Helmsley. While the Government has not documented its independent sources for all of the evidence in this lengthy investigation and trial in minute detail, as noted above it has no obligation to undertake such elaborate documentation where, as here, the subject matter of the state grand jury proceedings is unrelated to the subject matter of the federal investigation. Having reviewed the evidence offered at trial, as well as the Government's identification of its sources, the Court has no hesitation in concluding that none of the evidence that resulted in defendant Helmsley's indictment and conviction was derived, directly or indirectly, from her immunized testimony.

### III. *Defendant's Miscellaneous Assertions*

The defendant has attempted to leverage the impact of her limited and unrelated state grand jury testimony by setting forth a series of arguments, speculations and hypotheses as to how such testimony might have affected the federal prosecution. However, none of these hypothetical situations raises constitutional concerns, and a further hearing is not required to explore them. Four of the defendant's arguments warrant brief discussion.

### A. The "Chinese Wall"

■ Defense counsel poetically pens that "the much vaunted 'Chinese Wall' turns out to have been no 'Great Wall' at all, but more like a wall in a stage set, designed for show." D. "Post–Kastigar Hearing" Mem. at 1. Counsel correctly points out that in *United States v. Oliver L. North*, Cr. 88–0082 (D.D.C.), prosecutors established that they took elaborate steps to ensure that the "Chinese Wall" was adequate and took great pains to document the procedures developed to prevent taint. *See United States v. Poindexter et al.*, 698 F.Supp. 300, 307–08 (D.D.C.1988). While the prosecutors have not made such a showing here, the need for a "Great Wall" was much greater in *North* where the defendant's immunized congressional testimony was extensive and covered precisely the same ground as the criminal investigation. In contrast, Mrs. Helmsley's immunized testimony was extremely limited and was on an unrelated subject matter. In short, there is no requirement that the "Chinese Wall" be a "Great Wall" when the substance of the immunized testimony is so limited.

The Government has established that Roth acted as a "Chinese Wall" by reviewing Mrs. Helmsley's grand jury testimony and by assessing its content and possible applicability to the pending federal investigation. Roth determined that Peress' participation would not present a problem because the grand jury testimony was limited and its subject matter was unrelated to the matters the Government was investigating. Having reviewed the grand jury testimony,

the Court finds that Roth's determination was correct.

Thus, under the facts of this case, where the subject matter of the immunized testimony is unrelated to that of the federal investigation, the Government need not establish elaborate procedures to prevent taint. To the extent that the Government has a burden to show the existence of an adequate "Chinese Wall," it has done so here.

### B. Sales Tax Questions Before the Federal Grand Jury

Defense counsel points to one or two isolated instances of sales tax questions posed in the income tax grand jury investigation, and suggests that "sales tax issues could well have been pursued because Mrs. Helmsley's immunized testimony led prosecutors to believe that further inquiry could produce evidence of Mrs. Helmsley's 'tax intent.'" D. "Post–Kastigar Hearing Mem." at 5. These few questions, however, were made in the context of exhibits being shown to witnesses and thus were an inherently logical part of the inquiry at hand. For example, when the amount listed as the "sales tax" on an invoice was crossed out, the prosecutor naturally inquired into that practice. Since the federal indictment dealt with the purchases of goods and services, inquiry into sales tax matters was permissible and even to be expected.

### C. The New York Post Reporter

 Defense counsel also suggests that the Court should examine *Post* reporter Randall Pierson, to see if he was privy to Mrs. Helmsley's immunized testimony and whether he used that testimony to develop his December 2 story which sparked expansion of the federal income tax investigation. However, there is no evidence to suggest that any of Pierson's articles were in any legally significant

sense derived from Mrs. Helmsley's immunized testimony. Instead, all evidence is to the contrary.

The defendant points to the following. *The New York Times* broke the Van Cleef investigation story on November 6, 1986 based on court papers and "law enforcement sources."[7] Other papers followed suit. The press reports noted Mrs. Helmsley's appearance before the grand jury. Pierson's *New York Post* article concerning Dunellen expenditures was printed on December 2, 1986. Finally, in a *New York Post* article dated September 24, 1989, which explained how Pierson broke the income tax story, Pierson was quoted as saying that "[w]hen the Van Cleef thing came down it was like a shot of adrenaline." While Pierson recognized that the sales tax case was "in no way related to the charges later brought against the Helmsleys," Pierson saw a "morality connection." From all this, defendant urges a hearing into Pierson's knowledge and motives in breaking the Dunellen Hall story on December 2, 1986. The Court declines this invitation.

The fact that the publicity surrounding the Van Cleef & Arpels investigation[8] may have given Pierson a "shot of adrenaline" to pursue his pre-existing investigation into the income tax matter is of no legal significance since the prohibited "use" of immunized testimony does not extend to tangential, nonevidentiary influences on prosecutors, *U.S. v. Mariani, supra,* much less on the thought processes of a newspaper reporter whose article prompts a prosecutor's investigation and may have prompted witnesses to come forward. Rather, the test is whether "testimony or other information compelled under the [immunity] order (or any information directly or indirectly derived from such testimony) [was] used against the witness in [the] criminal case ..." 18 U.S.C. § 6002. The Government has satisfied this test and, thus, the Court

---

7. *See* "Leona Helmsley is Said to Evade Sales Taxes," *The New York Times,* November 6, 1986.

8. It is evident that the November 6 *New York Times* article was derived in principal part from the papers filed in state court by the Van Cleef

and Arpels defendants that included deposition testimony of a fired jewelry salesman who had dealt with Mrs. Helmsley and was now suing the jeweler.

need not inquire further into Pierson's sources.

### D. McCarthy and Other Witnesses

■ Defense counsel's plea for further inquiry into McCarthy's and other witnesses' possible knowledge of Mrs. Helmsley's immunized testimony can similarly be rejected. To the extent that McCarthy or other witnesses may have also received a "shot of adrenaline" out of news of the Van Cleef & Arpels investigation, there may have been some nonevidentiary, tangential connection between the immunized testimony concerning sales tax issues and McCarthy's or other witnesses' decision to provide information to the income tax investigation. Yet, as noted above, this type of connection on the facts of this case is of no constitutional significance. Witnesses' knowledge about Mrs. Helmsley's immunized testimony through press reports could have done little more than to prompt witnesses to come forward. Just as Judge Gesell refused to inquire into witnesses' thought processes in the *Poindexter* case, I refuse to do so here. The proper focus is whether a witness testifies solely to facts personally known to the witness, and there is no allegation that any witnesses has not done so here. *See Poindexter*, 698 F.Supp. at 307, 313–314.[9]

In effect, defendant suggests that if a famous or notorious person testifies under a grant of immunity and a well-publicized indictment setting forth information obtained in her immunized testimony ensues, and thereafter the Government seeks to prove the person's wrongdoing under unrelated facts, it must demonstrate that witnesses were not motivated to go forward as a result of the publicity. Nothing in *Kastigar* and its progeny suggests such a result. If it did, the effect could well be to give a wrongdoer immunity for future crimes unrelated to her testimony thereby conferring immunity far beyond use. As Judge Gesell similarly noted,

Even where extensive publicity was generated which included references to testimony given under use immunity, there is no basis for applying a different standard than that stated by the Supreme Court in considering the effect of use immunity on an individual's Fifth Amendment rights.

698 F.Supp. at 314. Accordingly, the Court rejects Mrs. Helmsley's overly broad reading of the immunity statute which is wholly unsupported by caselaw.

### IV. *Conclusion*

For the reasons stated above, the Court finds that in this case, where the substance of Mrs. Helmsley's immunized testimony is wholly unrelated to that of the federal investigation, a greater *Kastigar* than was held is not warranted. From its review of the immunized testimony, the federal grand jury and trial evidence, the history of the income tax investigation, and the parties' submissions, the Court is satisfied that the Government's evidence used in the federal grand jury and at trial was derived from sources independent of Mrs. Helmsley's immunized testimony on unrelated matters. Neither the investigation nor the prosecution of Mrs. Helmsley was the result of the direct or indirect use of immunized testimony or leads derived therefrom. Accordingly, the Court denies Mrs. Helmsley's motion to dismiss the indictment on Fifth Amendment grounds.

SO ORDERED.

---

**9.** Judge Gesell wrote that "the defendants' Fifth Amendment rights are not infringed if a witness hears testimony and yet testifies solely to facts personally known to the witness." 698 F.Supp. at 314. In allowing witnesses to have their recollections refreshed by the immunized congressional testimony, Judge Gesell went much further than I need to here.